In the Matter of Teresa Jean WATSON a/k/a T. J. Watson, Debtor.

Larry PELLICCIONE, Plaintiff,

v.

Teresa Jean WATSON a/k/a T. J. Watson, Defendant.

Bankruptcy No. 81-2366.
Adv. No. 82-146.

United States Bankruptcy Court,
M. D. Florida,
Tampa Division.

Sept. 9, 1982.

John K. Shoemaker, Fort Myers, Fla., for plaintiff.

Philip L. Burnett, Fort Myers, Fla., for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a contested discharge proceeding and the matter in controversy is the right to a general bankruptcy discharge of Teresa Jean Watson a/k/a T. J. Watson (the Debtor) and her right to obtain relief through a discharge proceeding of a particular debt owed by her to Larry Pelliccione. It is the contention of Mr. Pelliccione (the Plaintiff) that the Debtor is indebted to him in the amount of $30,380.52: a liability represented by a final judgment entered against her in the Circuit Court in and for Lee County, Florida. According to the Plaintiff, this liability represented by the final judgment should be declared to be non-dischargeable by virtue of § 523(a)(2). In addition, it is the contention of the Plaintiff that the Debtor is not entitled to a general bankruptcy discharge by virtue of § 727(a)(2)(A) of the Bankruptcy Code. The evidence as developed at the final evidentiary hearing reveals the following:

Teresa Jean Watson, a/k/a T.J. Watson (the Defendant), is a Debtor involved in the Chapter 7 case. She was at the time relevant to the controversy the president and sole stockholder of a corporation known as T.J. Watson Insurance Agency, a corporation engaged in the business of general insurance, primarily casualty and property insurance. She was the sole licensed agent employed by the corporation authorized by the State of Florida to write policies. During the time relevant to the matters under consideration, the Defendant and the Plaintiff, had more than a casual relationship. In July, 1980, the Defendant indicated to the Plaintiff that she had financial problems, and had numerous pressing obligations arising out of the operation of the insurance business. Whether or not she requested financial assistance from the Plaintiff is unclear but it is without dispute that the Plaintiff did initially loan $10,000 to the Debtor. The Debtor did acknowledge this loan by executing a promissory note. The note called only for payment of interest. Thereafter, the Plaintiff advanced additional sums to the Defendant who again executed, in each instance, a promissory note for the amounts received. These loans were made in October 1980, December 1980 and June, 1981 in the amounts of $5,000, $4,000 and $8,000 respectively. The Defendant made some interest payments to the Plaintiff on the notes. The Plaintiff did not demand repayment of these loans until the romance ended, at which time he undertook active steps to collect on the notes. Not having received satisfaction either in his efforts to collect on the notes or in his attempts to reestablish his relationship with the Defendant and rekindle the old flame, on November 25, 1981, the Plaintiff filed a suit on the notes and ultimately obtained a final judgment by default in the amount of $30,380.52. Even after the entry of the judgment, the Plaintiff made further attempts to effect a reconciliation with the Defendant but when met with rebuttal, decided to enforce the obligation represented by the judgment.

The Plaintiff was well acquainted with the financial affairs of the Defendant. He very well knew that the Defendant did not own any properties of value which would be worthwhile to pursue. Notwithstanding this fact, on December 8, 1981 the Plaintiff obtained a writ of execution and delivered the same to the sheriff with directions to levy on the automobile of the Defendant and also on the corporate stock in T.J. Watson Insurance Agency, owned by the Defendant. Pursuant to his instructions, the

deputy sheriff, on December 10, 1981, went to the apartment of the Defendant which, by this time was shared by her with her new friend, Mr. Zinnbauer. After the deputy identified himself and requested payment of the judgment, the Defendant stated that she did not have the funds to satisfy the judgment. Thereafter, the deputy levied on the automobile, after allowing the Defendant to remove some personal effects from the car. The car was removed by a wrecker service and placed in storage. The deputy also requested the Defendant to surrender the corporate stocks in T.J. Watson Insurance Agency, but was told by the Defendant that she did not have the stocks and that they were in the possession of her attorney, Mr. DuPree.

After the deputy departed, the Defendant immediately went to the office of Mr. DuPree and requested the corporate stock book. Mr. Dupree complied and turned the stock book over to her after she signed a receipt for same. Thereafter, the Defendant contacted her current attorney who instructed her to bring the stock book to his office. After some discussion it was decided that the stocks should be transferred to Mr. Zinnbauer ostensibly as a sale for the consideration of $1,500. It is without dispute that the consideration was not based on any predetermined actual value of the stock but was determined solely with reference to her current monetary needs, to-wit the funds needed by her to pay the attorney fees for the bankruptcy proceeding and to pay back rent, utilities and some miscellaneous bills.

In the meantime, the deputy contacted Mr. DuPree's office and inquired as to the whereabouts of the stock certificates but was told that the Defendant had already picked up the stock book. The deputy returned to the apartment of the Defendant and again demanded the surrender of the stock certificates. He was informed that the certificates had been sold, that she was no longer the owner of the stocks and the stocks were now owned by Mr. Zinnbauer. It is noteworthy that at the time this alleged sale took place, Mr. Zinnbauer was not a licensed insurance agent although he had applied for a license. It is equally noteworthy that the Defendant continued to operate the agency, the same way she did before this alleged change of ownership, since she was the only licensed agent and did continue to operate the agency, in spite of the alleged sale of her interest in the corporation, until a few months later when she left the State of Florida and moved to Tennessee.

Based on the following facts it is the contention of the Plaintiff first, that the debt evidenced by the final judgment should be declared to be non-dischargeable because the monies loaned to the Defendant were obtained by the Defendant by false pretenses. The claim of non-dischargeability is based on the contention that the monies loaned by the Plaintiff to the Defendant were not used to pay the bills of the agency but for her personal needs.

Second, it is the contention of the Plaintiff that the Defendant did, within one year of her bankruptcy petition, transfer properties i.e. stock certificates, with intent to hinder, delay or defraud a creditor. Therefore, she is not entitled to a general bankruptcy discharge by virtue of § 727(a)(2)(A).

Considering these contentions, seriatim, it is clear that this record is totally devoid of any evidence, that the monies loaned by the Plaintiff to the Defendant were loaned for any specific purpose, other than the purpose of assisting her, in general. Even assuming, but not admitting that the monies loaned were given for the sole purpose of paying the bills of the insurance agency and they were not used for that purpose, this alone would not sustain the claim of non-dischargeability. This record leaves no doubt that had the Defendant continued her relationship with the Plaintiff, there would never have been any problem or question concerning the use of the monies lent. It follows from the foregoing that the Plaintiff failed to establish with persuasive evidence that the Defendant did obtain the monies by false pretenses or that the Plaintiff relied on any false pretense or

**941**

false representation by the Defendant. Therefore, the claim of non-dischargeability on this ground cannot be sustained.

 This leaves for consideration a more troublesome question which relates to the charge that the Defendant did, with intent to hinder, delay or defraud a creditor, transfer properties within one year from the date of her petition. It is clear and it is generally recognized that an act by the Defendant designed to hinder or delay the creditor in reaching assets to satisfy his judgment, may be sufficient to prevent a discharge. *In re Rowe,* 234 F.Supp. 114, (E.D.N.Y. 1964), even in the absence of an actual intent to defraud the creditor. This was the law before the enactment of the Bankruptcy Code under § 14(c)(4) of the Bankruptcy Act of 1898. There is nothing in the corresponding section of the Code dealing with this subject nor in the legislative history of § 727(a)(4) which would require a different conclusion. It is of equal importance, however, that when the method chosen by the debtor to delay or hinder the creditor is a transfer of the property to another, it must be shown that there was "an actual transfer of valuable property belonging to the debtor which reduced the assets available to the creditors and which was made with a fraudulent intent". 4 Collier on Bankruptcy § 727.02(5).

There can hardly be any doubt that the Defendant did in fact transfer her stock certificates to her new boyfriend within one year of her bankruptcy petition. However, there is a serious doubt that this technical transfer was, in fact, an actual sale or merely a device to prevent seizure of the stock through levy. It should be pointed out that Mr. Zinnbauer had no contact with the insurance business and was not a licensed agent; the Defendant remained in control of the agency, wrote all policies and checks, as she had prior to the transfer and continued as sole licensed agent authorized to write policies. In addition, Mr. Zinnbauer wasted no time reimbursing himself the money allegedly "paid" for the stock. Thus, the record clearly points to the conclusion that this was not a bona fide sale, but merely a subterfuge, and at most, a temporary loan by Mr. Zinnbauer to the Defendant.

It is important to note, at this point, that, as noted earlier, the purchase price was not determined with reference to the value of the stock but rather with reference to the Defendant's immediate need for monies. Further, it is clear that the actual stock transferred had no value whatsoever. It was not a marketable item, but merely stock in a closely held corporation, a corporation without any assets of consequence. There is no evidence in this record as to the extent or value of the receivables or "dailys" which might have produced income for the corporation in the future. The corporation had nothing but bare potential to generate income through future sales of insurance policies by a duly licensed agent. In sum, while this record supports the claim that there was a technical transfer, done with the specific intent to prevent seizure of the corporate stock through levy, it is clear that the property transferred by the Debtor was worthless and had no meaningful value. Clearly, the transfer of the worthless stock did not result in a reduction of assets available to the Plaintiff since even a successful levy on the stock certificates would not and could not have produced monies to satisfy his judgment. This being the case, this Court is constrained to conclude that the claims set forth in Counts II and III of the complaints which relate to fraudulent transfer of stock, cannot be sustained.

A separate final judgment will be entered in accordance with the foregoing.