In re Jimmy Stuart **MORRIS** and Babette Howland Morris, Debtors.

**FEDERAL DEPOSIT INSURANCE CORPORATION and United States Gypsum Company, Plaintiffs,**

v.

**Jimmy Stuart MORRIS, Defendant.**

**Bankruptcy No. 3–84–00277.**
**Adv. No. 3–84–0269.**

United States Bankruptcy Court,
E.D. Tennessee.

July 29, 1985.

Morton, Lewis, King & Krieg, E. William Linam, Knoxville, Tenn., for plaintiff Federal Deposit Ins. Corp.

Hyder & Hyder, Michael O. Hyder, Johnson City, Tenn., for plaintiff U.S. Gypsum Co.

Weller, Miller, Carrier, Miller & Hickie, Samuel B. Miller, II, Johnson City, Tenn., for defendant.

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

At issue is whether debtor Jimmy Stuart Morris is entitled to a discharge of his debts. Plaintiffs, two objecting creditors, contend the debtor has transferred property with intent to hinder, delay, or defraud creditors within one year before the date of the filing of his petition. 11 U.S.C.A. § 727(a)(2) (1979). Also, plaintiffs contend the debtor has concealed property of the bankruptcy estate of Leisure, Inc., a corporation in which debtor is an "insider," during the pendency of Leisure's case. 11 U.S.C.A. § 727(a)(7) (Supp.1985).[1] While admitting he failed to disclose two transfers of property occurring only days prior to his bankruptcy filing, debtor denies any intention to hinder, delay, or defraud creditors. Further, debtor maintains his failure to report income of Leisure, Inc., used to pay two unscheduled debts, is attributable to oversight, not an intentional concealment.

### I

Experiencing an average annual salary of $60,000 during the last five years, the debtor is a successful insurance salesman with fifteen years of experience. His bankruptcy filing is attributable to unsuccessful business ventures, particularly Leisure, Inc., a corporation wholly-owned by the debtor.

On February 22, 1984, debtor and his wife, Babette Morris, filed their joint chapter 7 petition. A statement of financial affairs and schedules were filed concurrently with the petition. Two transfers of debtor's property occurring only five days previous to bankruptcy are not disclosed in the original statement of financial affairs.[2] Plaintiffs contend debtor made each transfer with intent to hinder, delay, or defraud his creditors.[3] (No objection to Babette Morris' discharge has been filed.)

---

1. Though originally asserted in their complaint, plaintiffs have tacitly withdrawn their objection to discharge for failure to satisfactorily explain a loss of assets, 11 U.S.C.A. § 727(a)(5) (1979). The asset in question, $2,500, has been accounted for.

2. An amendment reporting the two transfers was filed only after the trustee confronted the debtor with questions about them.

3. A third transfer of property by the debtor is also questioned. On July 19, 1982, debtor acquired the assets and assumed a secured indebtedness of Video Library of Kingsport. According to debtor, very shortly thereafter he transferred his interest in the business to Morris Enterprises, Inc., a corporation wholly-owned by Barry Morris, debtor's son. In August 1982 Morris Enterprises began to pay debts of Video Library of Kingsport. Indeed, Morris Enter-

Section 727(a) of Title 11 of the United States Code enacts in part:

> The court shall grant the debtor a discharge, unless—
>
> .    .    .    .    .
>
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—
>
> (A) property of the debtor, within one year before the date of the filing of the petition; or
>
> (B) property of the estate, after the date of the filing of the petition....

11 U.S.C.A. § 727(a)(2) (1979).

The court recently considered this statute, noting:

> To sustain an objection under Code § 727(a)(2) a plaintiff must prove:
>
> (1) a transfer, removal, destruction, mutilation, or concealment
>
> (2) involving property of—
>
> (a) the debtor and occurring within one year of the petition filing date; or
>
> (b) property of the estate and occurring postpetition
>
> (3) whereby the debtor intended to hinder, delay, or defraud a creditor. Significantly, it is not necessary to prove fraud; because the statutory language is disjunctive, an intent to hinder or delay suffices. *In re Perlmutter*, 256 F. 862, 869 (D.N.J.1919), *aff'd sub nom. Perlmutter v. Hudspeth*, 264 F. 957 (3rd Cir.1920). Under Code § 727(a)(2) actual intent to hinder, delay, or defraud is necessary; a constructive fraudulent transfer is insufficient to support denial of discharge. *Bank of Pennsylvania v. Adlman*, 541 F.2d 999, 1003 (2d Cir.

1976); *In re Fragetti*, 24 B.R. 392, 396 (Bankr.S.D.N.Y.1982). Although the intent must be actual it may be proved through circumstantial evidence. *Farmers Coop. Ass'n v. Strunk*, 671 F.2d 391, 395 (10th Cir.1982); *Montgomery Ward & Co., Inc. v. Gordley*, 38 B.R. 630, 632 (Bankr.S.D.Ohio 1984).

*Comprehensive Accounting Corp. v. Morgan*, 43 B.R. 264, 271 (Bankr.E.D.Tenn. 1984).

### Transfer of Interest in Lot 5 of West Oakland Park Subdivision

■ The first transfer not disclosed in debtor's statement of financial affairs is his conveyance of a fractional interest in real estate to Jon R. Johnson, by warranty deed dated February 17, 1984, in consideration of $2,500, used to pay the debtor's attorney fee for services in his personal bankruptcy case. The acknowledgment date reflected in the deed is February 20, 1984, the same date debtor signed his statement of financial affairs. Debtor testified he thought the transfer was disclosed in his statement. Debtor's attorney concedes the transfer was disclosed to him and represents to the court that the omission is his fault, not the debtor's. Apparently, debtor's review, if any, prior to signing his statement of financial affairs was careless.

The issue, however is not a question of a false oath. 11 U.S.C.A. § 727(a)(4)(A) (1979). Instead, the question is whether debtor transferred his interest in the lot with intent to hinder, delay, or defraud creditors. There is no evidence of either inadequate consideration or a close relationship between the debtor and his transferee. The purpose of the transfer was to obtain funds to pay debtor's attorney for his services in this bankruptcy case.[4] Failure to disclose the transfer in the statement of financial affairs was unintentional. Under these circumstances, debtor did not

---

prises made payments against a $50,000 loan obtained by debtor to enhance the Video Library inventory. When Video Library of Kingsport went out of business, in or about April 1983, its inventory was transferred to Video Library of Johnson City, a business owned by

Morris Enterprises. These facts do not establish a transfer within the scope of § 727(a)(2).

4. According to their schedules, debtor and his wife had only $100 cash and $300 in a checking account as of the date of their petition.

make the transfer with intent to hinder, delay or defraud creditors.

### Transfer of Partnership Interest in Video Library of Newland

On February 17, 1984, debtor transferred to Barry Morris, his son, a one-half interest in a general partnership known as Video Library. According to debtor, the consideration for the transfer was his son's agreement to assume liability for a partnership debt to a North Carolina bank (Northwestern Bank).[5] This transfer, not disclosed in debtor's original statement of financial affairs, is within the circumscription of § 727(a)(2) according to plaintiffs.

Video Library of Newland, originally a three-member partnership, began doing business in November 1981. The original partners were Bruce Smith, Steve Wilson, and the debtor. Each original partner contributed approximately $5,000 in cash or goods to the partnership. Additionally, the partnership borrowed $20,000 from Northwestern Bank. The business is operated by Smith's wife, the only full-time employee. Her wages are $100 per week, the amount she must pay her babysitter.

In the fall of 1983 Wilson withdrew from the partnership. Over debtor's objection, Smith paid Wilson not less than $5,000 from partnership funds upon his withdrawal. Debtor objected to the payment because Wilson was not entitled to anything under the withdrawal term of the partnership agreement. However, Smith testified he felt Wilson should have been paid for his one-third interest in the partnership because he had originally contributed capital. Upon Wilson's withdrawal, Smith and the debtor each owned a one-half interest in the partnership.

Debtor's explanation for failing to disclose the transfer to his son in his original statement of affairs is that he thought the partnership interest was worthless and that it was not necessary to report it. According to his attorney, debtor's motive for transferring his interest only days before his bankruptcy was to avoid any disruption of the partnership.

Video Library is one of four video businesses in Newland, North Carolina, a town with a population under 2,000. On the transfer date the assets of Video Library were worth approximately $7,000; its liabilities consisted of an $8,000 debt to Northwestern Bank and an estimated $3,000 obligation to its lessor to restore the premises it leases. Smith testified he and his wife had received no income from Video Library except her wages. The debtor testified he had never received any income from the partnership business. However, Robert Weaver, the debtor's accountant, testified the debtor reported income of $200 to $300 from the partnership on his 1983 federal tax return.[6]

When his bankruptcy petition was filed debtor was still liable to Northwestern Bank for the Video Library partnership debt. However, he did not schedule the bank as a creditor. His only explanation for omitting the bank is "because the transaction [presumably, the transfer of debtor's partnership interest to his son] wasn't even disclosed." Further, debtor also did not report his involvement in the Video Library partnership in response to question 2c in the statement of affairs.[7] The incorrect response to this inquiry and the failure to schedule Northwestern Bank certainly appear calculated to conceal the transfer.

The plaintiff has the burden of proof at the trial of his objection to discharge. Bankr.Rule 4005, 11 U.S.C.A. While the burden of going forward with

---

5. Debtor testified he did not know the name of the bank. A renewal note evidencing the debt identifies Northwestern Bank as the creditor bank.

6. Weaver could not be specific. He testified from memory since he did not have the records with him at trial.

7. The question recites: "Have you been in a partnership with anyone, or engaged in any business during the 6 years immediately preceding the filing of the original petition herein?" The only response by the debtor is "Tri-Cities Gypsum."

evidence may shift after plaintiff establishes a prima facie case, *First Texas Savings Ass'n v. Reed*, 700 F.2d 986, 992 (5th Cir. 1983), the ultimate burden of persuasion remains on the plaintiff. *First Federated Life Ins. Co. v. Martin*, 698 F.2d 883, 887 (7th Cir.1983).

■ Although plaintiffs established a prima facie case under § 727(a)(2), the court is not persuaded that debtor transferred his interest in Video Library with the requisite intent to hinder, delay, or defraud creditors. Recognizing the payment of not less than $5,000 to Wilson from partnership funds and the reduction (from $20,000 to $8,000) of the partnership debt to Northwestern Bank (in less than thirty months), nonetheless, debtor's testimony that he believed his partnership interest was worthless as of February 17, 1984, is credible. Though mistaken in his testimony that he never received any income from the partnership, the court finds debtor's testimony on this subject was not intentionally false. Overlooking the small amount he did receive, debtor believed he had been a partner in a business for more than two years which had not provided him with any income. Further, there is a glut of competitors for the video business in the relevant market area. Most significantly, the liabilities of Video Library exceeded the value of its tangible assets on the transfer date.

Unless the court orders otherwise, it is a debtor's duty to file schedules and a statement of financial affairs. 11 U.S.C.A. § 521(1) (Supp.1985). Such documents should be correct and complete. The court certainly does not condone the omission of the transfer in debtor's statement of affairs. However, his belief that his partnership interest was worthless when transferred negates any intent to hinder, delay, or defraud creditors. *See Devorkin v. Security Bank & Trust Co.*, 243 Fed. 171 (6th Cir.1917) (even though trustee might have obtained some value for release, transfer of worthless equity of redemption not suf-

ficient grounds for denying discharge); *Pelliccione v. Watson*, 22 B.R. 938 (Bankr. M.D.Fla.1982) (discharge not precluded under § 727(a)(2) where property transferred had no value whatsoever).

## II

Debtor formerly owned, and leased to Leisure, Inc., commercial property improved with a bowling alley. Debtor was the president and sole shareholder of Leisure. On December 18, 1981, debtor and Leisure obtained a $25,000 loan from Interstate Automatic Merchandisers of America, Inc. (Interstate). The loan proceeds were used to pay Leisure's debts. Interstate owned the vending and video game machines in Leisure's bowling alley. According to Robert Byrd, Jr., president of Interstate, he had done business with the debtor for some time. Byrd told the debtor he would either make or help him obtain a loan to pay Leisure's debts if the monies from Interstate's machines were appropriated to repay the loan. The note evidencing the $25,000 loan, and signed by the debtor in both an individual and representative capacity for Leisure, recites in part:

> The proceeds from all the machines of Interstate Automatic Merchandisers of America, Inc., located on the ... [bowling alley] premises, and leased to us, are to be paid each month on said [$25,000] indebtedness.... [8]

The $25,000 note is endorsed with full recourse by Interstate to the order of First Tennessee Bank of Greeneville (FTB).

A restricted account in the name of "Jim Morris Leisure Lanes" was established at FTB. Leisure's share of the monies from the vending and video game machines was deposited to the account. Only FTB or its permitee could make withdrawals from the account. When a payment on the $25,000 note was due FTB made a withdrawal and appropriated it against the note indebtedness. If the account balance was insufficient to make a payment when due either

---

8. The parties' stipulation reflects that the lessee's share from the vending and video machines belonged to Leisure. Debtor did not assert that any portion of the lessee's share was his personal property.

FTB or Interstate notified the debtor. Because Leisure's revenues always declined when the bowling leagues disbanded for summer, the debtor was called upon to, and did, deposit personal funds to the restricted account.

Neither the debtor nor any employee of Leisure had access to the monies in the vending and video game machines. Collection from these machines by Interstate's employees, the only ones with keys to the machines, were observed by an employee of Leisure. Receipts were issued in the form of collection reports for monies removed from the video game machines.[9] Interstate obtained cashier's checks, payable to FTB, equalling Leisure's share of the video monies, at First Tennessee Bank of Johnson City, where the bowling alley was located. These cashier's checks were forwarded to FTB, and the proceeds were deposited to the restricted account. No receipts were issued for monies collected from the vending machines. Instead monthly statements of Leisure's share of the monies were provided by Interstate. Leisure's share of the vending machine monies was deposited to the restricted account through checks issued by Interstate payable to FTB.

On April 19, 1983, debtor borrowed $10,000 from FTB to pay expenses incurred by Leisure. The note evidencing the debt is signed by the debtor individually and as president of Morris Enterprises, Inc. (In fact, the debtor was not president, but vice-president, of Morris Enterprises.) Leisure is not a signatory of the note. The note is cosigned by Interstate. Payments against this note were made in the same manner as those on the $25,000 note.

On July 1, 1983, Leisure filed a voluntary chapter 11 petition, accompanied by its statement of financial affairs and schedules, all signed by the debtor, the corporate president. When Leisure filed its petition the unpaid principal balance on its $25,000 note was $7,104.51. The unpaid principal balance on the $10,000 note to FTB, executed only ten weeks before Leisure's bankruptcy by the debtor, Morris Enterprises, and Interstate, exceeded $9,000. However, Leisure did not schedule FTB, Interstate, Morris Enterprises, or the debtor as creditors.[10]

Robert Weaver, debtor's personal accountant since 1981, testified that he believes he became the accountant for Leisure in October 1982. Weaver was responsible for maintaining Leisure's books and records; he also wrote checks against Leisure's account. Weaver knew more than the debtor about the details of Leisure's financial affairs. Though the information for Leisure's schedules and statement of financial affairs was furnished principally by Weaver, debtor testified that he believes he assisted in the preparation of Leisure's schedules. Oddly, debtor never informed Weaver of Leisure's $25,000 note held by, or the restricted account at, FTB.

On January 27, 1984, seven months after filing under chapter 11, Leisure filed a motion to convert to chapter 7. The conversion order was entered on February 9, 1984, thirteen days prior to commencement of debtor's case.

Leisure's monthly reports, four in number, prepared by Weaver, were all filed on the same date (January 6, 1984). None of the reports are signed. The reports do not disclose the income from either vending or video game machines.[11] The reports also

---

9. The receipts were issued by A.B.C. Amusement Co., a trade name for Interstate.

10. There is no evidence that either the debtor or Morris Enterprises intended to make a gift of the $10,000 loan proceeds to Leisure. FTB was not willing to make the loan to Leisure because of uncertainties involving the collateral Leisure offered. Apparently FTB was willing to accept a security interest in the equipment and inventory of Video Library of Johnson City, owned by Morris Enterprises, Inc.

11. According to Weaver, vending expenses and revenues shown in the monthly reports represent a change fund. If Interstate did not provide quarters for the fund, a check to obtain coins would be written against Leisure's pro shop account. The check was treated as an expense item and the coins purchased were apparently treated as revenue.

do not reflect postpetition payments to FTB from the restricted account. Debtor was not familiar with the monthly reports. He did not know whether the reports included income from vending or video game machines, and he could not explain items designated as vending machine expenses. It is debtor's testimony that he saw some of the monthly reports, occasionally looking at them and occasionally not.

Weaver was not aware of the collection report receipts issued when monies from the video game machines were removed. Sonny Cox, the manager of Leisure Lanes beginning in August 1983, testified that these receipts were not given to Weaver. According to Cox, the debtor told him to leave the receipts in a file cabinet at Leisure Lanes.[12] However, Cox also testified that a monthly statement of vending machine proceeds was sent to Weaver's office. There is no explanation for the omission in the monthly reports of Leisure's share of the vending proceeds. Furthermore, Weaver testified he knew there were video game machines at Leisure Lanes; but he did not know the disposition of the monies emptied from the machines until shortly before Leisure's case was converted to chapter 7.

Neither Interstate nor FTB received formal notice of Leisure's bankruptcy filing. Accordingly, FTB continued to make withdrawals from the restricted account, appropriating monies of the Leisure, Inc. estate, 11 U.S.C.A. § 541(a)(7) (1979), to reduce the indebtedness on the $25,000 and $10,000 notes it held. Indeed, the final payment on the $25,000 note was made on February 21, 1984, only one day prior to commencement of debtor's bankruptcy case.[13] Nearly $10,500 in postpetition income from the

vending and video game machines at Leisure was credited against the $25,000 and $10,000 notes held by FTB.

Section 727 of Title 11 of the United States Code recites in relevant part:

(a) The court shall grant the debtor a discharge, unless—

. . . . .

(7) the debtor has committed any act specified in paragraph (2) ... of this subsection ... in connection with another case, under this title or under the Bankruptcy Act, concerning an insider. . . .

11 U.S.C.A. § 727(a)(7) (Supp.1985).

Plaintiffs contend discharge should be denied because the debtor, undisputedly an "insider"[14] as to Leisure, Inc., concealed property of the Leisure bankruptcy estate with intent to hinder, delay, or defraud creditors. 11 U.S.C.A. § 727(a)(2) (1979). Postpetition income of Leisure in excess of $10,000 is not disclosed in Leisure's monthly reports. The two debts, evidenced by notes on which the debtor himself is personally liable, against which this income was credited were not reported in Leisure's schedules.

While plaintiff has established a prima facie case of concealment, debtor denies any intent to hinder, delay, or defraud creditors. He maintains he was not involved in the preparation of Leisure's monthly reports. Yet, as the president and sole shareholder of Leisure, he was responsible for filing verified monthly reports including a statement of receipts from all sources and disbursements for all purposes.[15] Having failed to make a complete disclosure to Leisure's accountant, debtor could not rely upon the accountant to fulfill his own duty.

12. Contrary to plaintiffs' assertion during closing argument, Cox did not testify that the debtor told him not to give the receipts to Weaver.

13. Although several $1,000 payments were credited against the $25,000 note, most were for substantially smaller amounts. Interestingly, the two largest payments, $2,048.93 and $2,630.50, were made respectively on January 13 and February 8, 1984. With the exception of these two payments, no other credit against the

note exceeded $1,000. There is no direct evidence in the record on whether this is merely coincidental.

14. A corporate officer is an "insider" where the debtor is a corporation. 11 U.S.C.A. § 101(28) (Supp.1985).

15. See Local Rule VI (Monthly and Weekly Reports in Chapter 11 Cases).

Tacitly suggesting an absence of benefit to him or motive for concealment, debtor insists he had no access to the FTB restricted account and no keys to the vending and video game machines. But Leisure's share of the monies collected postpetition from the vending and video game machines was credited against notes on which debtor was personally liable. More than $3,000 was applied to the $10,000 note on which Leisure was not a signatory.

Though not an unsophisticated businessman, debtor has failed in a variety of business ventures. According to his accountant, debtor has adequate business and financial knowledge, but debtor's knowledge "does not extend well into details at all."

Debtor's explanation for failing to schedule FTB, Interstate, Morris Enterprises and himself as creditors in Leisure's bankruptcy case is that he did not think about Leisure's obligation for the $25,000 and $10,000 [16] loans because of the manner—through the restricted bank account—in which FTB was paid. Supporting his explanation that the omission is due to oversight, debtor testified that he reported the two debts in his personal bankruptcy schedules. Though he did schedule a $10,000 debt to FTB, the debt evidenced by the $25,000 note is, understandably, not scheduled because it was paid in full prior to debtor's bankruptcy. Further, there is no self-evident connection between the $10,000 obligation omitted from Leisure's schedules and the debtor's scheduled $10,000 debt to FTB. The nature of debtor's $10,000 debt to FTB is reported in his schedules as "Endorser of loan to Morris Enterprises, Inc."

Debtor's explanation for omitting from Leisure's schedules claims paid through the restricted account at FTB is not credible. Less than two and one-half months before Leisure filed bankruptcy, debtor obtained a $10,000 loan on Leisure's behalf. Yet, debtor failed to schedule this obligation (to Interstate, Morris Enterprises, Inc., and debtor himself [17]) in Leisure's bankruptcy case. Further, the summer filing date of Leisure's bankruptcy petition is significant. Because debtor deposited personal funds to the FTB restricted account during summer months when Leisure's revenues were insufficient to make payments on the two notes held by FTB, it is highly improbable that debtor overlooked the obligation of Leisure paid through the restricted account.

■ Undeniably, debtor knew monies in which Leisure had an interest were collected postpetition (Leisure's) from the vending and video game machines at Leisure Lanes. These monies were credited against obligations for which debtor was personally liable. Debtor concealed, or permitted the concealment of, these monies by not reporting the revenue in Leisure's monthly reports.[18] Furthermore, debtor did not disclose the "Jimmy Morris Leisure Lanes" restricted account at FTB in Leisure's statement of financial affairs. He also failed to disclose the account in his own bankruptcy statement of financial affairs.

■ The circumstantial evidence of intent to hinder, delay, or defraud through concealment of vending and video machine monies is substantial. Debtor's failure to report in Leisure's case monies from the vending and video game machines, his omission in Leisure's schedules of claims paid with these monies, and his failure to disclose the restricted account at FTB is prima facie evidence of intent to hinder, delay, or defraud creditors. No credible explanation is proffered to rebut this evidence of intent to hinder, delay, or defraud creditors.

Pursuant to § 727(a)(7) debtor's discharge must be denied because with intent to hinder, delay, or defraud creditors, he concealed, or permitted the concealment of,

---

**16.** See note 10, *supra.*

**17.** See note 10 and accompanying text, *supra.*

**18.** Debtor is not necessarily exonerated because a creditor received the monies. Concealment from all creditors is not necessary to bar discharge. *Kolesinski v. Mashey,* 127 F.2d 528 (2d Cir.1942).

property of the Leisure, Inc. estate after the filing date of Leisure's petition. 11 U.S.C.A. § 727(a)(2)(B) (1979).

This Memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 7052.