**In the Matter of Alfred B. BROOKS and Dorthea M. Brooks, Debtors.**

**Thomas V. GIEL and Margaret G. Giel, Plaintiffs,**

v.

**Alfred B. BROOKS and Dorthea M. Brooks, Defendants.**

**Bankruptcy No. 83–767.
Adv. No. 83–1148.**

United States Bankruptcy Court,
W.D. Pennsylvania.

March 10, 1986.

---

463

Charles F. Bennett, Leventon & Leventon, P.C., Pittsburgh, Pa., for plaintiffs.

Henry E. Rea, Jr., Brandt, Milnes, Rea & Wagner, Pittsburgh, Pa., for defendants.

William P. Tedesco, U.S. Dept. of Labor, Arlington, Va.

**MEMORANDUM OPINION**

BERNARD MARKOVITZ, Bankruptcy Judge.

Presently before this Court is a Complaint by Plaintiffs objecting to the discharge of Mr. Alfred B. Brooks (hereinafter "Debtor").[1] Specifically, Plaintiffs

1. At a hearing on June 28, 1984, Plaintiffs withdrew their objection to the discharge of Mrs. Dorthea M. Brooks.

contend that the Debtor should be denied a discharge under §§ 727(a)(2)(A) and 727(a)(4)(A) of the Bankruptcy Code, for transferring property within one (1) year of filing in order to hinder, delay or defraud creditors, and for knowingly and fraudulently making a false oath. Based upon the pleadings submitted and subsequent hearings thereon, this Court finds that the Debtor's discharge should be denied pursuant to §§ 727(a)(2)(A) and 727(a)(4)(A).

## FACTS

The Debtor is a self-employed accountant. Collaterally, he owns several corporations and also holds himself out to investors as a business consultant. In that vein, the Debtor offers to make investments for individuals, promising very profitable returns. Once an individual makes an investment, that money is loaned to other individuals, using the Debtor's various wholly-owned corporations as conduits for these transfers. The Plaintiffs in this action are investment creditors of the Debtor.

Prior to the filing of his bankruptcy petition, the Debtor owned a company known as Brooks Market, Inc. This company was wholly-owned by the Debtor, but was managed by the Debtor's son. Within one (1) year prior to the filing of this petition in bankruptcy, Debtor transferred full ownership in Brooks Market, Inc. to his son in exchange for $500.00. Testimony taken shows that the company had accrued large liabilities, including delinquent federal taxes. Debtor claims that the company was worthless and if the transfer did not occur, the Debtor would continue to be faced with additional personal liability for the tax debt.

At hearing it was determined that Twin Brooks Memorial Works, Inc. (hereinafter "TBMW") employed the Debtor as an accountant and business manager. TBMW began to suffer financial setbacks and was in need of an influx of capital. Over a period of many years, the Debtor provided TBMW with loans. The Carlinis, principals of TBMW, claimed at hearing they had no knowledge of the funding source, other than the Debtor, individually. The Debtor contends that the debts of TBMW are owed in part to Brooks Market, Inc., and, in part, to an "Agency" account, representing the various individual investors' capital investments.

Several attempts were made to negotiate repayment schedules between TBMW and the Debtor, but none of these plans came to fruition. However, one plan discussed, a transfer of TBMW preferred stock in a dollar amount equal to the outstanding debt, was made on the books of TBMW. Both the Debtor and TBMW allege that the transfer never occurred. The Debtor claims however, that the *book* transfer was made in anticipation of the arrangement, which subsequently fell through.

## LEGAL ANALYSIS

Section 727 of the Bankruptcy Code is the core of the fresh start provision in bankruptcy law, permitting the honest debtor to receive a new start in life free of the manacles of debt. The right to discharge in bankruptcy is statutory, and not within the Court's discretion. Furthermore, Section 727 is to be liberally construed in favor of the debtor and against the objecting party. *See In re Adlman,* 541 F.2d 999, 1003 (2d Cir.1976); *In re Shebel,* 54 B.R. 199, 202 (Bktcy.D.Vt.1985); *In re Cycle Accounting Services,* 43 B.R. 264, 270 (Bktcy.E.D.Tenn.1984); *In re O'Connor,* 32 B.R. 626, 628 (Bktcy.E.D.Pa. 1983); *In re Rubin,* 12 B.R. 436, 440 (Bktcy.S.D.N.Y.1981); *In re Dee,* 6 B.R. 784, 786 (Bktcy.W.D.Pa.1980)

The plaintiff has the burden of proving his objection to discharge. Bankruptcy Rule 4005. *In re Gordley,* 38 B.R. 630, 631 (Bktcy.S.D.Ohio 1984). Although the burden of going forward may shift after plaintiff establishes a prima facie case, the ultimate burden of persuasion remains upon the plaintiff. *In re Lineberry,* 55 B.R. 510, 511 (Bktcy.W.D.Ky.1985); *In re Cycle Accounting Services, supra* at 270; *In re Shebel, supra* at 202. The evidence must be such that, when considered in light of all the facts, the Court

concludes that "the debtor has violated the spirit of the bankruptcy laws and should therefore be denied the privilege of eliminating the legal obligation of his debts." *In re Cohen,* 47 B.R. 871, 874 (Bkrtcy.S.D. Fla.1985).

We turn first to our analysis of Section 727(a)(2)(A), which states:

(a) The court shall grant the debtor a discharge, unless...

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed...

(A) property of the debtor, within one year before the date of the filing of the petition; or

To meet the burden of proof for objection to discharge under § 727(a)(2)(A), the plaintiff must establish:

1) that the debtor transferred or concealed property;

2) that such property belonged to the debtor;

3) that the transfer or concealment occurred within one year of the filing of the petition; and

4) that the debtor transferred or concealed the property with the intent to hinder, delay, or defraud a creditor.

*In re Shumate,* 55 B.R. 489, 493 (Bktcy.W. D.Va.1985); *In re Gordley, supra* at 631; *In re Rubin, supra* at 441.

In the case at bar, there is no argument that the debtor transferred Brooks Market, Inc. to his son. Further, there is, of record, testimony that Brooks Market, Inc. was a corporation wholly-owned by the debtor, and that the transfer occurred within one year of the filing of the debtor's bankruptcy petition. The sole issue to be determined is whether the debtor transferred the property with the intent to hinder, delay or defraud a creditor. The debtor alleges that he sold Brooks Market, Inc. to his son for five hundred dollars ($500.00),

and that this was fair consideration because: 1) liabilities of the corporation were greater than its assets; and, 2) federal taxes outstanding were accruing against the corporation, for which the federal taxing authority was pursuing collection. Further, the debtor claims no attempt was made to defraud any creditor, and therefore § 727(a)(2)(A) should not apply. Plaintiffs contend that Brooks Market, Inc. had assets greater than its liabilities, and that the transfer did have the effect of delaying, if not actually defrauding, a creditor.

■ To meet the burden of proof as to the fourth element, the plaintiff must show that the debtor had intent to hinder, delay, or defraud. *In re Shumate, supra; In re Cycle Accounting Services, supra* at 271; *In re Perry,* 40 B.R. 811, 815 (Bktcy.M.D. Tenn.1984); *In re Gordley, supra* at 632. However, actual fraudulent intent may be determined by circumstantial evidence, or inferences drawn from a course of conduct. *In re Shumate, supra; In re Morris,* 51 B.R. 462, 464 (Bktcy.E.D.Tenn.1985); *In re Cycle Accounting Services, supra; In re Rubin, supra* at 441. Since it is clear that a debtor will not voluntarily testify that his intent was fraudulent, the court has the authority to deduce such fraudulent intent from all of the facts and circumstances of the case. *In re Shumate, supra* at 494; *In re Nazarian,* 18 B.R. 143, 146 (Bktcy.D. Md.1982).

Several courts have discussed the various indices by which fraudulent intent can be uncovered. These "badges of fraud" include:

1) an absence or negligible amount of consideration;

2) the value which the transfer gave to or took from the debtor's estate;

3) the time in which the transfer occurred;

4) the relationship between the debtor and his transferee;

5) the debtor's financial condition at the time of the transfer;

6) the concealment of the transfer; and,

7) whether the transfer occurred while a collection lawsuit against the debtor was either threatened or pending.

*In re Perry, supra* at 815–16; *In re Rubin, supra* at 442.

■ In the case at bar, several of these "badges" are present. We first look to the financial nature of the transfer. The debtor sold his interest in Brooks Market, Inc. to his son for $500.00. At the hearing, the debtor testified that the business was worth approximately $65,000.00, and the outstanding debt totaled $130,000.00. The debtor also testified that the property had been on the market for eleven (11) years prior to his purchasing of the land and building, and a buyer could not be found. At the hearing the debtor valued the land at $10,000.00, the building at $45,000.00, and claimed that maintenance of the property cost between $5,000.00 and $10,000.00 per year. However, at the time the business was transferred to his son, the Debtor listed the total assets of Brooks Market, Inc. as having a book value of $143,000.00, claiming that the building alone had a book value of $95,000.00. Additional elicited testimony showed that the Debtor had listed the property for sale at $225,000.00. The difference between a listed sale price of $225,000.00 and a claimed market value of $65,000.00 is so extreme as to automatically elevate this representation to an indication of fraud. Property, normally an appreciating asset, does not plummet in value by over seventy percent (70%), absent complete destruction.

In examining the value given to or taken from the estate, it is clear that nothing was received by the estate and a potential asset was lost. The $500.00 received for the property has not been preserved for the estate. If the property had remained in the Debtor's possession, it could have been sold, with the proceeds being used to pay secured creditors. It must be assumed that Brooks Market, Inc. would have brought a greater price than $500.00. Since the Internal Revenue Service (hereinafter "IRS") lien stood at approximately $23,000.00 at the time of transfer, and by the Debtor's own testimony the property was worth at least $65,000.00, that debt would have been paid, and presumably, other creditors would be paid as well.

The transfer occurred within one year of the Debtor's bankruptcy. In and of itself, this is one of the criteria the plaintiff must prove in order for his objection to be granted. When this is coupled with the fact that the transfer was made to a close relative, his son, the badges of fraud begin to multiply. Several courts have held that a transfer for little or no consideration to a close relative is clear evidence of fraudulent intent. *See In re Butler,* 38 B.R. 884, 888 (Bktcy.D.Kan.1984); *In re Nazarian, supra* at 150; *Matter of Loeber,* 12 B.R. 669, 675 (Bktcy.D.N.J.1981); *In re Rubin, supra* at 442.

Finally, we look to the outstanding debt owed for delinquent taxes. At the hearing, the Debtor testified that the IRS did not want to accept a modified payment arrangement to cure the delinquencies. Furthermore, the Debtor testified that the IRS was going to pursue him personally for the outstanding deficiency, and in order to avoid additional responsibility for the continued accrual, he transferred the business to his son. The release from further liability for the debt was, in the Debtor's own words, "....a key motive.", in his transfer of the property to his son. (Transcript of June 28, 1984, p. 32, line 8) Clearly this shows a belief on the part of the Debtor that a collection lawsuit was being threatened, and is indicative of fraudulent intent.

Taken as a whole, overwhelming evidence is present to draw the conclusion that the transfer of Brooks Market, Inc. was conducted in an attempt to hinder, delay, or defraud a creditor. The four elements of proof having been met, the Debtor's discharge is denied pursuant to § 727(a)(2)(A).

We next turn to the objection to the Debtor's discharge pursuant to § 727(a)(4)(A), which states:

(a) the court shall grant the debtor a discharge, unless...

(4) the debtor knowingly and fraudulently, in or in connection with the case...

(A) made a false oath or account;

■ Two elements must be proven in order for discharge to be denied under this section: 1) the debtor's oath must have been knowingly and fraudulently made; and 2) it must have been related to a material fact. *In re Lineberry, supra* at 513; *In re Bailey,* 53 B.R. 732, 735 (Bktcy.W.D. Ky.1985); *In re Kessler,* 51 B.R. 895, 899 (Bktcy.D.Kan.1985). If a false statement or omission of fact in a Statement of Financial Affairs, or a Schedule is due to mistake, the discharge is generally not denied. However, the purpose of § 727(a)(4)(A) is to insure that debtors provide all of the necessary information upon which anyone with reason to know can rely. *In re Seablom,* 45 B.R. 445, 449 (Bktcy.D.N.D.1984). The trustee and creditors are entitled to know what property has passed through the debtor's possession prior to his petition in bankruptcy. *In re Diodati,* 9 B.R. 804, 807 (Bktcy.D.Mass.1981). Additionally, the materiality of the false oath or account does not require that any of the creditors were prejudiced by the false statement. Rather the question of materiality goes to the issue of its pertinence to the discovery of assets and/or past transactions. *In re Kessler, supra* at 899; *In re Butler, supra* at 889; *In re Wasserman,* 33 B.R. 779, 780 (Bktcy.S.D.Fla.1983); *In re Nazarian, supra* at 146.

■ In the case at bar, the Debtor has either omitted or falsely stated several pieces of information on his Schedules and Statement Of Financial Affairs. The Debtor does not list the debt owed by TBMW in the amount of $32,901.71, including principal and interest. The Debtor claims this is not listed on his Schedules because the debt was not owed to him personally, but rather was owed to his investment client-creditors. The Debtor testified, however, that the invested money was put into several corpora-

tions of which the Debtor was the chief, if not the sole stockholder. These corporations are all listed on the Debtor's Schedules as defunct.

The Debtor also held an Agency account, which served as a conduit for the receipt and payment of loan money held by these defunct corporations. If TBMW did receive loans, and if that money is owed to the Debtor's corporations and therefore owed to the investment client-creditors, the amount of $32,901.71 should appear somewhere in the Schedules, either as a debt owed to the Debtor, or as a debt owed to the defunct corporations.

There exists further indication that this debt was knowingly omitted from the Debtor's Schedules. The Debtor listed a claim he held against Trimark Manufacturing Company in the amount of $7,000, which the Debtor lists as not recoverable. Yet, the debt owed by TBMW to the other corporations, which the Debtor considered presently but not permanently unrecoverable, is not listed anywhere. The Debtor's claim that he did not think this information was relevant is not a decision for the Debtor to make. "It is the Debtor's role simply to consider the question[s] [on the Schedules] carefully and answer [them] completely and accurately....the duty is on the Debtor to answer and not evaluate." *In re Diodati, supra* at 808. (brackets added).

If this were the only acknowledged omission or false statement, this Court might be persuaded that the problem was inadvertent or a mistake. However, an additional omission and/or false statement has occurred which is of even greater materiality than the first. This concerns the elusive transfer of stock in TBMW to the Debtor. The Debtor and TBMW both assert that the transfer never occurred. The Debtor claims that the entry on TBMW's books was made in anticipation of a deal which was not consummated. However, the entry was never removed or negated by the Debtor, and gives all appearances to any-

one who might look at the books, as an exchange of stock in consideration of release from the debts TBMW allegedly owes to Brooks Market, Inc. and the "Agency" account. Furthermore, when Brooks Market, Inc. was transferred to the Debtor's son, no accompanying entry was made on the TBMW books to transfer the appropriate amount of stock.

The difficulty which this raises cannot be fully understood without examining the underlying rationale. The Debtor stated in his testimony that he wanted the shares of preferred stock to protect the investments in the hope that TBMW would someday become very profitable. However, having completed the transfer of Brooks Market, Inc. to his son without an attendant transfer of the stock, that stock if transferred in fact at a later date, will become the property of the Debtor. Furthermore, if the Debtor is discharged, and therefore released from the debts owed to his investment client-creditors, the stock representing that loan amount would also belong to the Debtor. The final outcome is that if TBMW does turn itself around, the Debtor will be holding over $84,000 worth of stock and his creditors will be left holding the bag. Based upon these glaring affronts to the importance of honesty and integrity in the filing of a bankruptcy petition, the Debtor's discharge is denied pursuant to § 727(a)(4)(A).

## CONCLUSION

The fresh start offered by the Bankruptcy Code is easily the most extensive since that explained in the Old Testament (Deuteronomy 15:1 & 2). The requirement imposed upon the debtor to not be deliberately dishonest is a reasonable quid pro quo for release from his financial hardship. Similarly, if a debtor is unprepared to provide honest answers and actions, preferring to adopt a cavalier and arrogant attitude toward truthfulness, this Court cannot in good conscience grant the discharge.

An appropriate Order will issue.