In re Glenn M. ROBERTS, Debtor.

B.K. MEDICAL SYSTEMS, INC. PENSION PLAN, et al., Plaintiffs,

v.

Glenn M. ROBERTS, Defendant.

B.K. MEDICAL SYSTEMS, INC. PENSION PLAN, et al., Plaintiffs,

v.

Glenn M. ROBERTS, Defendant.

Donald R. CALAIARO, Trustee for Glenn M. Roberts, Plaintiff,

v.

Glenn A. ROBERTS, Robert L. Roberts and Glenn M. Roberts, Defendants.

Donald R. CALAIARO, Trustee of Estate of Glenn M. Roberts, Plaintiff,

v.

Glenn M. ROBERTS and Evelyn Jean Roberts, Defendants.

Donald R. CALAIARO, Trustee of Estate of Glenn M. Roberts, Plaintiff,

v.

Evelyn Jean ROBERTS, Glenn M. Roberts, Robert Miller, Joshua Miller, Glenn Roberts, III, Celia Roberts, Kelly Roberts, and Barbara Leann Roberts, Defendants.

Donald R. CALAIARO, Trustee of Estate of Glenn M. Roberts, Plaintiff,

v.

Glenn M. ROBERTS and Evelyn Jean Roberts, each individually and as Trustees of Glenn M. Roberts Medical Associates Inc. Employees' Pension Plan; and the Glenn M. Roberts Medical Associates Inc. Employee Pension Plan, Defendants.

Bankruptcy No. 85–541.
Adv. Nos. 85–380, 85–381, 86–158, 86–159 to 86–161.

United States Bankruptcy Court, W.D. Pennsylvania.

Dec. 9, 1987.

Robert O. Lampl, Janice L. Morison, Pittsburgh, Pa., for debtor.

Richard A. Finberg, Berger, Kapetan, Malakoff & Meyers, P.C., Pittsburgh, Pa., for plaintiff/trustee.

Donald R. Calaiaro, Pittsburgh, Pa., Trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

### PREAMBLE

Featured in this unusual bankruptcy scenario is the Debtor manipulating his various corporations over the decades so as to cheat and defraud innocent investors out of their life savings. These machinations culminated in Debtor's conviction for bankruptcy fraud. His sentence was five (5)

years probation and a $5,000.00 fine, plus $25,000.00 restitution.

Concurrent with the criminal determination, Debtor manipulated his private and basically ill-gotten wealth in order to remove it from the reach of his defrauded creditors, holding a civil judgment in excess of $1.6 million.

Noted author, William Safire, in his novel *Freedom,* speaks of Thurlow Weed's characterization of Francis P. Blair; specifically, it is stated that "... if Francis P. Blair had lived at the time of the Garden of Eden, the serpent's presence would have been superfluous." *Freedom* by William Safire at p. 125.

Clearly the above is an overstatement of the situation at hand. Equally clearly, the characterization has an analogical basis.

## CASES STATED AND DETERMINATIONS

Before the Court are two Motions and six Adversary Complaints combined for the purposes of trial and decision, to-wit:

1) *Motion to Amend Schedules and Statement of Affairs* by Glenn M. Roberts (hereinafter "Debtor");

2) *Trustee's Objections to Debtor's Original and Amended Claimed Exemptions;*

3) *Trustee's Complaint For Turnover of Property* fraudulently transferred, specifically, the professional corporation known as Glenn M. Roberts Medical Associates Inc., conveyed by the Debtor to one or more of his children;

4) *Trustee's Complaint to Avoid Transfer of Property* fraudulently conveyed, including many and various asset transfers from the Debtor individually to himself and his wife as tenants by the entireties;

5) *Trustee's Complaint to Avoid Fraudulent Transfers of Property,* specifically certain rental payments made to a joint venture account held for the benefit of Debtor's grandchildren;

6) *Trustee's Complaint for Turnover of Assets Claimed as Exempt,* specifically contributions to the Debtor's pension plan, maintained by his medical practice;

7) *Complaint to Determine Dischargeability of Debt* filed by a certified class of judgment creditors objecting to the discharge of their $1.6 million claim under § 523(a)(2)(A), (a)(4), and (a)(6); and

8) *Complaint* by the certified class of judgment creditors *Objecting to Debtor's Discharge* in its entirety under § 727(a)(2)(A), (a)(3), (a)(4)(A), (a)(4)(D), (a)(5) and (a)(7).

Having completed more than three full days of testimony, carefully examining all exhibits, and thoroughly considering all briefs and proposed findings of the parties, we hold as follows:

1) Debtor's Motion To Amend Schedules is DENIED, same having been filed in bad faith;

2) Trustee's Objections to Debtor's Claimed Exemptions, Original and Amended, are GRANTED;

3) Trustee's Complaint for Turnover of Debtor's Medical Corporation is GRANTED;

4) Trustee's Complaint for Avoidance of Transfers made by the Debtor to Himself and His Wife is GRANTED;

5) Trustee's Complaint for Avoidance of Transfers made to the Joint Venture is GRANTED;

6) Trustee's Complaint for Turnover of Debtor's Pension Plan is GRANTED;

7) Judgment creditors' Objections to the Dischargeability of Their Claim is GRANTED; and

8) Judgment creditors' Objection to Debtor's Discharge is GRANTED.

Because of the very nature of this case, we reach holdings in all of the above-captioned actions. Each action will be discussed *seriatum,* based upon a single factual foundation.

## FACTS

Debtor is an osteopathic physician, having substantial education and experience. He has accumulated significant assets over

the course of his life, including both real and personal property.

Debtor was a fifty percent (50%) owner, vice president and a director of several associated discount finance companies (hereinafter the "Crescent companies"). Beginning in 1980, Debtor and his partners concocted a scheme wherein they took investments from various clients, knowing that the Crescent companies were in serious financial difficulty, and further knowing that these clients would never see their investments again. In 1981, the Crescent companies entered into bankruptcy proceedings, with no assets to repay their many large investors. Debtor and his partner each secreted away approximately $125,000.00 of funds from the Crescent companies.

The investment creditors formed a certified class and brought suit against the Debtor and his associates, both in their individual capacities and as controlling persons in relation to the Crescent companies. On October 10, 1984, a judgment was entered in the action against the individual defendants, jointly and severally, for $1.6 million, plus interest and costs.

Prior thereto, on May 14, 1984, criminal indictments for mail fraud and securities fraud were filed against Debtor and his associates. Thereafter, Defendant pled guilty to a reduced charge of bankruptcy fraud in the Crescent cases.

As required by the United States Probation Office, for the purposes of determining restitution and fines, Debtor employed his accountant to prepare a financial statement as of the period ending December 10, 1984. Based upon this financial statement, which indicated almost all assets as held by the entireties, Debtor was sentenced to (1) pay $25,000.00 in restitution for the benefit of the Bankruptcy Trustee in the Crescent cases, (2) pay a fine of $5,000.00, and (3) serve a probation of five (5) years.

On March 15, 1985, Debtor paid his restitution and fines, and immediately thereafter filed an individual bankruptcy petition. Debtor's original Schedules and Financial Statements were due on that date; however, as is the practice of this Court, if an emergency filing occurs, Debtor is granted a 15-day extension on the filing of his supportive documentation. Debtor's Schedules, due under the extension by March 30, 1985, were not filed until April 16, 1985.

A first meeting of creditors was held on June 4, 1985. Thereafter, on June 18, 1985, the judgment creditors filed objections to Debtor's claimed exemptions. Debtor responded to same on July 3, 1985. On July 26, 1985, the judgment creditors filed their Objections to Dischargeability of Debt and Objections to Discharge. The Answer to the Dischargeability Complaint was due on August 30, 1985, but was not filed until September 11, 1985. The Answer to the Complaint for Denial of Discharge, due September 9, 1985, was not filed until October 22, 1985.

On August 16, 1985, Debtor filed a Motion To Amend his Schedules and Statement of Affairs. On September 11, 1985, the Trustee responded to Debtor's Motion to Amend and also filed Objections to Debtor's claimed exemptions, both original and Amended. Thereafter, an additional creditors' meeting was held on September 25, 1985.

As a result of this chronology of events, including several interrogations of the Debtor and substantial additional discovery, the Trustee filed several adversary Complaints to recover property which he believed was fraudulently transferred. All four actions were filed on March 5, 1986. Three of the four required Answers by April 11, 1986; one required an Answer by April 16, 1986. One Answer was filed on April 22, 1986; one was filed on May 1, 1986; the two remaining Answers were not filed until August 15, 1986.

## I. Debtor's Motion To Amend Schedules and Statement of Affairs

▮▮▮▮ Motions to amend Schedules are to be liberally allowed. *Matter of Gershenbaum*, 598 F.2d 779 (3rd Cir.1979); *Lucius v. McLemore*, 741 F.2d 125 (6th Cir.1984); *Tignor v. Parkinson*, 729 F.2d 977 (4th Cir.1984). In fact, Rule 1009 of the Rules of Bankruptcy Procedure specifi-

cally allows a debtor to amend his schedules as a matter of course at any time before the case is closed. The only reasons which have been held as exceptions to this procedure are: 1) a showing of bad faith; or 2) prejudice to the creditors, *Lucius v. McLemore, supra; Matter of Doan,* 672 F.2d 831 (11th Cir.1982), by clear and convincing evidence. *Matter of Brown,* 56 B.R. 954 (Bankr.E.D.Mich.1986). ·

> If debtors could omit assets at will, with the only penalty that they had to file an amended claim once caught, cheating would be altogether too attractive.
>
> . . . .
>
> When it is hard to detect an effort to evade the law, the penalty must exceed the profits of the evasion.

*Payne v. Wood,* 775 F.2d 202, 205 (7th Cir.1985).

■ The facts of this case show by clear and convincing evidence that Debtor's Schedules, both original and Amended, were filed in bad faith.

Debtor's original Schedules were filed thirty-two (32) days after his voluntary petition was entered, staying all actions by creditors, yet providing those creditors with no substantive information. Debtor's Amended Schedules were filed four (4) months after the original, late-filed Schedules were presented, and a full five (5) months after the original filing.

In the interim, there were two (2) Meetings of Creditors and substantial discovery. After the assets were discovered by the Trustee the Debtor sought this Amendment. The Court believes there is a causal relationship between the Trustee's discovery and the proposed Amendments.

Debtor claims that the following twenty-four (24) items were "inadvertently" omitted from his original Schedules:

1. That it was later determined that Debtor had only a life estate interest in said sum is irrelevant. The Schedules specifically require all property interests to be listed. This interest would necessarily have been listed under Schedule B–2(v), or at the very least, Schedule B–3(b).

2. Debtor claims he was listed on said account only as a convenience to his mother. In that case, the account should have been listed at Number 6 on the Statement of Affairs. How-

1) *Statement of Affairs—2(e) Income From Other Sources*

Debtor originally listed income received from and used to maintain various rental properties, and $12,000.00 annually in stock dividends; Debtor's amendments included $33,000.00 received from his father's decedent estate [1], and $387.00 from his mother's decedent estate.

2) *Statement of Affairs—4(a) Accounts or Certificates of Deposit*

Debtor originally listed three accounts held with his wife; his Amended Schedules added an account upon which he was listed with his mother before her death.[2]

3) *Statement of Affairs—12(b) Transfers Of Property Within One Year Of Filing Petition*

Debtor entered the following on his original Schedules:

Debtor transferred property known as:

from Glenn M. Roberts to Glenn M. Roberts and Jean E. Roberts, husband and wife.

The significance of the blank space is not explained; on Debtor's Amended Schedules he lists an 80–acre parcel of land as being transferred from his individual name to entireties name, the transfer of his medical association to his two sons, and the sale of a one-acre lot, held by the entireties, to a third person.

4) *Schedule B–1—Real Property*

Debtor listed forty-seven (47) properties having values ranging from $600.00 to over $40,000.00, and totaling $453,883.00; Debt-

ever, his mother died on March 8, 1984, over a year before the filing and almost 18 months before the Schedules were completed. By Order of the Common Pleas Court of Washington County, dated May 10, 1984, Debtor had a one-third (⅓) interest in said sum, minus administrative costs. Said sum should have been listed on Schedule B–2, or at the very least, Schedule B–3(b).

or "inadvertently" omitted his residence, with a fair market value of $60,000.00 and the Burgettstown Hotel, having a fair market value of $44,211.00.[3]

### 5) Schedule B-2(b)—Deposits

Debtor originally listed a nominal checking account at the First National Bank of Washington, a money market account at the same bank and a money market account at Lincoln Savings and Loan; Debtor's Amended Schedules include an IRA account at First National and a checking account at Mellon Bank.

### 6) Schedule B-2(f)—Automobiles

Debtor originally listed three (3) vehicles with a combined value of $4,400.00; on his Amended Schedules he listed two (2) additional vehicles, one with a value of $1,500.00 and another with a value of $5,300.00. Debtor claims these vehicles, although titled to Debtor and his wife, were purchased by the Medical Association and were not originally listed because they were treated as corporate assets.[4]

### 7) Schedule B-2(p)—Liquidated Debts Owed To Debtor

Debtor's original Schedules show "none" as the entry on this item; on the Amended Schedules, Debtor lists himself and his wife as mortgagees on certain real property with an outstanding balance due of $5,000.00.

### 8) Schedule B-2(r)—Insurance Policies

Debtor's original Schedules listed "none"; Debtor's amendment identifies a

pension plan with Glenn M. Roberts Medical Associates, with a value at the time of filing of approximately $500,000.00.[5]

### 9) Schedule B-2(t)—Stocks

Debtor originally listed a total of 5,096 shares of stock in four different concerns; Debtor's Amended Schedules add 10,677 additional shares in five additional companies.

### 10) Schedule B-2(u)—Partnerships

Debtor originally listed no interest in any partnership of any kind; his Amended Schedules added interests in four different partnerships.

### 11) Schedule B-3—Property Not Otherwise Scheduled

Debtor originally listed nothing under this category; Debtor's Amended Schedules show an oil and gas lease at $3.00/acre, total acreage not listed.

An additional creditors' meeting occurred on September 25, 1985, over one month after Debtor's amendment was filed. From that meeting, and additional discovery, the Trustee uncovered the following additional omissions:

a) Debtor's original Schedules listed 5,096 shares of stock, 4,350 in Laurel National Bank; Debtor failed to advise, either in his original or Amended Schedules and Statements, that 528 shares of the Laurel National Bank stock were transferred from Debtor's name to entireties ownership.[6]

---

**3.** Debtor has not attempted to explain the "inadvertent" omission of the two most valuable properties, while remembering to list all of the other less significant parcels. By not listing these assets on the original Schedules, however, Debtor decreased his net assets by $100,000.00.

It is also interesting to note that while the Schedules list the Debtor's residence as having a value of $60,000.00, Debtor maintained a fire insurance policy on said residence with a value of $80,000.00.

**4.** As will be more fully discussed *infra*, Debtor claims the corporation had no value at the time he transferred ownership of same to his sons. Either the cars are the Debtor's and were omit-

ted, or they belong to the corporation, giving value to same. The Debtor made no attempt to clarify this discrepancy.

**5.** Of all the assets omitted, this is perhaps the most perplexing. This asset could have been listed in several places, such as Statement of Affairs, No. 7, Property Held By Another; Schedule B-2(v) Powers and Rights Exercisable for the Benefit of the Debtor; or for lack of any other certainty, the catchall provision of Schedule B-3(b). Its omission carries great weight.

**6.** The Trustee asserts that at the time of filing, the 528 shares had a fair market value of $34,-000.00.

b) Debtor omitted interests in a 1984 tax refund, valued at $6,000.00.[7]

c) Debtor possesses an annuity with Nationwide Insurance, valued at $13,221.00.

d) Debtor possesses an additional IRA account with Thomas McKinnon Securities, valued at $2,200.00.

e) Debtor has an interest in a Cash Equivalent Fund, the value of which has not yet been ascertained.

f) A Reserve Fund, with a value of $2,500.00, was transferred from Debtor's individual name to joint ownership with his wife within the year prior to the filing of the bankruptcy petition.

g) A paid-up life insurance policy with Manufacturers Hanover, having a cash value of $6,500.00, which matured in favor of the Debtor on December 5, 1987.

h) A debt owed to Debtor by the Medical Association, totaling $6,855.00.

i) Ownership in whole or in part, in Nu-Veen tax-exempt bonds, total value of which is presently unknown.

j) Debtor's Amended Schedules listed 10,000 shares of Corporate Investment Company stock; said amendment neglects to inform that 7,500 of these shares were transferred from individual to entireties name within one year prior to the filing of the bankruptcy petition.

k) Debtor's Amended Schedules include 500 shares of JLG Industries; the stock certificate is dated March 7, 1985. Debtor asserts that this is not an attempt to change shares to entireties name, but that this certificate represents a stock split. In that case, we still are without the original certificate, and, more importantly, it means Debtor really has an interest in 1000 shares, rather than 500. No explanation is offered.

Any one of these discrepancies might be pardonable as an inadvertent omission; in an estate this complex, even three or four missed items could be overlooked. However, the sheer magnitude of omissions, not just from the original Schedules, but from the Amendments as well, coupled with the factual scenario behind the $1.6 million judgment, makes this far too clear a case of bad faith to permit the Amendments. It is hard to imagine a more compelling circumstance appearing in this Court. Debtor's clear attempt to conceal assets and thereby deny creditors any hope of even partial recompense is chilling, and the amendment must be denied.

## II. Objection to Exemptions

Pursuant to § 541(a)(1) of the Bankruptcy Code, all legal and equitable interests of the debtor in property become property of the estate. This broad concept also includes any interest in property recovered by the Trustee, § 541(a)(3), and any proceeds, rents or profits from estate property, except personal services performed by the debtor, § 541(a)(6). Property of the estate even includes that property which the debtor requires for a "fresh start". After the estate is created, the debtor is permitted to claim certain of the property as exempt. *Tignor v. Parkinson, supra; In re Graham,* 726 F.2d 1268 (8th Cir. 1984); *In re Barsotti,* 7 B.R. 205 (Bankr. W.D.Pa.1980).

Section 522 of the Code outlines the options available to a debtor in choosing the types of property to be exempted. Subsection (b) of § 522 gives the debtor the choice of taking those exemptions statutorily created in subsection (d), or the exemptions otherwise provided by federal, state and local law.

Section 522 also provides the debtor with the right to claim as exempt certain property recovered by the trustee. However, in order to obtain such an opportunity, the property must have been:

(1) recovered under §§ 510(c)(2), 542, 543, 550, 551 or 553;

(2) exemptable by the debtor, had the property not been transferred; and

(3)(A) transferred involuntarily and without concealment; or

(B) avoidable under § 522(f)(2).

---

7. The refund has since been denied by the IRS; however, when the Debtor believed such a refund was forthcoming, he made no attempt to disclose it.

Concealment of an asset bars a debtor from exempting same. *Redmond v. Tuttle*, 698 F.2d 414 (10th Cir.1983); *Matter of Doan, supra.* We have already determined that Debtor originally concealed the assets listed in the amendments to his bankruptcy petition, and there has been no claim by Debtor that he was forced to do so. In point of fact, the method by which these assets were uncovered appears to have followed a distinct pattern. In each instance the Trustee would inquire as to whether the Debtor was aware of any additional assets. The Debtor's response would be to the effect that he could think of none. Thereafter, the Trustee would ask about a certain asset he had discovered and the Debtor would acknowledge and explain same. This charade was replayed again and again, as each asset was uncovered by the Trustee. It is obvious that the Debtor intended to offer no information without the Trustee's instigation. Therefore, the Debtor will not be entitled to exempt any of those items. Similarly, those assets discovered by the Trustee which Debtor omitted from both his original and Amended Schedules are barred from exemption. *See Matter of Cipa, infra.* Furthermore, any property recovered by the Trustee which was fraudulently conveyed by Debtor is not available for exemption.[8] *Redmond v. Tuttle, supra.*

If a debtor does not claim as exempt, property that might be subject to exemption, said property remains part of the estate. *Matter of Cipa*, 11 B.R. 968 (Bankr.W.D.Pa.1981); *In re Ford*, 3 B.R. 559 (Bankr.D.Md.1980). What remains therefore, are the exemptions claimed by Debtor in his original Schedules. Debtor claimed exemptions pursuant to § 522(b)(2), which states in pertinent part:

(b) Notwithstanding section 541 of this title, an individual debtor may exempt from property of the estate the property listed in either paragraph (1) or, in the alternative, paragraph (2) of this subsection ... Such property is—

(2)(A) any property that is exempt under Federal law, other than subsection (d) of this section, or State or local law that is applicable on the date of the filing of the petition at the place in which the debtor's domicile has been located for the 180 days immediately preceding the date of the filing of the petition, or for a longer portion of such 180–day period than in any other place; and

(B) any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

On Schedule B–4 of his petition Debtor claims as exempt all Pennsylvania statutory exemptions and all property held with his wife as tenants by the entireties. Those exemptions provided by Pennsylvania statute, 42 Pa.C.S.A. §§ 8123 and 8124, include:

a) real or personal property up to a value of $300.00;

b) wearing apparel;

c) bibles and school books;

d) sewing machines belonging to seamstresses or for private family use;

e) uniforms and accoutrements;

f) certain specified pension, annuity and retirement benefits; and

g) certain specified insurance policy proceeds.

Debtor has also claimed exemptions in all property held by him with his wife as tenants by the entireties; this type of property may be "exempt from process under applicable nonbankruptcy law," provided the creditor can look to only one of the tenants for payment. 11 U.S.C. § 541(b)(2). *See Sterrett v. Sterrett*, 401 Pa. 583, 166 A.2d 1 (1960), *cited in Patterson v. Hopkins*, 247 Pa.Super. 163, 371 A.2d 1378, 1382 (1977) ("Pennsylvania subscribes to the majority view which regards entireties property as

---

8. Determinations as to fraudulent conveyances of specific property are made and discussed *infra*. This section states only that any finding of fraudulent conveyance will remove such property from the possibility of exemption.

unavailable to creditors of *one* of the tenants."); *see also, Matter of Cipa, supra; In re Barsotti, supra.*

A conveyance of real or personal property to a husband and wife, without more, creates an estate by the entireties. *Shapiro v. Shapiro,* 424 Pa. 120, 224 A.2d 164 (1966); *Holmes' Estate,* 414 Pa. 403, 200 A.2d 745 (1964); *Brenner v. Sukenik,* 410 Pa. 324, 189 A.2d 246 (1963); *Heatter v. Lucas, et al.,* 367 Pa. 296, 80 A.2d 749 (1951). At common law and under early Pennsylvania law, any conveyance to both husband and wife, wherein there existed the unities of time, title, interest, and possession, created an estate by the entireties without regard to the intention of the parties. *Matter of Heatter v. Lucas, supra; Stuckey v. Keefe's Executors,* 26 Pa. 397 (1856). Now, however, tenancy by the entireties is only presumed. *Holmes Estate, supra.* Intention has become the "cardinal and controlling element", and if the parties' intention is proved to be otherwise, the presumption is rebutted. *Brenner v. Sukenik, supra; Heatter v. Lucas, supra,* 80 A.2d at 752 ("The presumption and even desirability of the qualitative holding arising out of the marital union is not so strong that it may be permitted to affect the quantitative holdings otherwise apparent on the face of the instrument."). Pennsylvania law provides no impediment to the creation of a joint tenancy or tenancy in common between husband and wife. *Brenner v. Sukenik, supra; Heatter v. Lucas, supra.* However, in order to rebut the presumption of entireties, the Court must be provided with clear and convincing evidence to the contrary. *Shapiro v. Shapiro, supra; Holmes Estate, supra.*

In the case at bar, evidence was submitted indicating certain properties, real and personal, were held individually, as joint tenants, or as joint tenants with right of survivorship. This Court holds that any property titled to Glenn M. Roberts and E. Jean Roberts with nothing more, or Glenn M. Roberts and E. Jean Roberts, his wife, or Glenn M. Roberts and E. Jean Roberts, ten. ent., is entireties property. However, any property titled to Glenn M. Roberts individually, or Glenn M. Roberts and E. Jean Roberts, "jt ten." or Glen M. Roberts and E. Jean Roberts "JTWROS" is not entireties property. It is not "exempt from process under applicable nonbankruptcy law", and therefore, is not exemptable from the bankruptcy estate.

### III. Complaint By The Trustee To Recover Value Of Debtor's Medical Practice Pursuant To § 548(a) Of The Bankruptcy Code And The Pennsylvania Uniform Fraudulent Conveyance Act

The Trustee has raised this Complaint asserting that Debtor's transfer of his medical practice to his sons constitutes a fraudulent conveyance, under § 548 of the Bankruptcy Code and the Pennsylvania Uniform Fraudulent Conveyance Act, 39 P.S. §§ 354, 357.

Section 548(a) states in pertinent part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

(1) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

This section is paralleled by the applicable Pennsylvania law which states as follows:

### § 354. Conveyances by insolvent

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent, is

fraudulent as to creditors, without regard to his actual intent, if the conveyance is made or the obligation is incurred without a fair consideration.

§ 357. **Conveyance made with intent to defraud**

Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Section 548(a)(1) and § 357 are the respective intentional fraud provisions: the only issue is whether actual fraudulent intent existed at the time of conveyance and whether creditors were in some way prejudiced thereby. *U.S. v. Gleneagles Investment Co., Inc.*, 565 F.Supp. 556 (M.D.Pa. 1983). Since it is clear that a debtor is not likely to volunteer testimony as to his fraudulent intent, we can establish same from the circumstantial evidence presented in the case. *In re Factory Tire Distributors, Inc.*, 64 B.R. 335 (Bankr.W.D.Pa. 1986); *Matter of Brooks*, 58 B.R. 462 (Bankr.W.D.Pa.1986); *Continental Bank v. Marcus*, 242 Pa.Super. 371, 363 A.2d 1318 (1976).

Glenn M. Roberts Medical Association was incorporated in 1971: Glenn M. Roberts was the sole shareholder and director; he also served as president, and E. Jean Roberts, his wife, served as secretary.

On or about May 31, 1984, Debtor transferred his entire interest in Glenn M. Roberts Medical Associates to Dr. Glenn A. Roberts and Dr. Robert Roberts, his sons. Glenn A. is an osteopath, like his father; Robert is a chiropractor.

The stock certificate does not provide a date of transfer; however, at trial the parties testified that the transaction occurred in 1984 and was set to occur at the end of the fiscal year—in this case May 31st. Aside from the stock certificate itself, there is no record of any agreement relating to the transfer. At trial Debtor testified that the corporation was really transferred only to Glenn A., and contingently to Robert. It appears that Robert, a chiropractor, could not be authorized to own

part of an osteopathic practice without prior approval from both the Osteopathic and Chiropractic Boards. (To date, such approval has not been vigorously pursued.) Debtor and his sons were all aware of this requirement, yet the stock certificate clearly indicates a transfer by Debtor to *both* sons.

Although the date of the stock transfer is not written on the certificate, Debtor, Glenn A. and Debtor's accountant all testified that the transaction occurred at the end of the fiscal year, May 31st, in 1984. This date is very important as:

1) prior to that date, a civil action was commenced against Debtor and others in connection with the Crescent cases;

2) on April 19, 1984, just six weeks prior, judgment was entered against Debtor and others, in an amount to be later determined;

3) on May 18, 1984, the criminal indictments for mail and security fraud were filed;

4) on October 10, 1984, a final judgment was entered in the sum of $1.6 million plus interest and costs;

5) on October 30, 1984, Debtor pled guilty to charges of bankruptcy fraud;

6) as a result of said plea, Debtor was to make restitution in a specific dollar amount, pay a fine, and serve a five (5) year probationary period; and

7) in order to determine the appropriate amount of restitution, the U.S. Probation Office required an accounting of Debtor's net worth.

Debtor knew that criminal proceedings would result in fines and restitution at best. By reducing his assets, Debtor accomplished two objectives—he protected his corporation from his judgment creditors, and he reduced his net worth, thereby reducing the restitution assessment.

The Court finds that Debtor transferred his medical practice to both of his sons; did so within one year prior to the filing of his bankruptcy petition, and did so with actual intent to hinder, delay, or defraud his creditors, in violation of 11 U.S.C. § 548(a)(1) and 39 P.S. § 357.

■ Section 548(a)(2) and § 354 are the respective bankruptcy and state law "constructive fraud" provisions; "constructive" because neither section involves the issues of knowledge and intent. Rather, the determination of liability is based upon a lack of fair consideration and insolvency of the transferor. *U.S. v. Gleneagles, supra,* and cases cited therein. As Debtor has admitted insolvency at the time of transfer, we are left with a determination of whether the transfer was made for fair consideration. A transfer made to a close relative is especially suspect. *See Matter of Brooks, supra; Berger v. Kraisman,* 376 Pa. 127, 101 A.2d 717 (1954). Debtor asserted that at the time of the transfer, the corporation had no value. While all of the equipment has been fully depreciated, testimony indicated the existence of fourteen (14) rooms of furniture and medical equipment.[9] We are unable to accept the veracity of the contention that 14 rooms of furniture and equipment had no value. This is especially true given the $2,000.00 value placed on a mere four (4) items of used equipment donated by Debtor to Weirton Osteopathic Hospital.[10]

When Debtor's son, Glenn A., took the stand, he testified that the corporation was transferred to him in consideration for the multitudenous hours of services rendered during the previous two (2) years.

> During that time period I had received no payment for taking care of those patients, and I—*there was a debt incurred to me* from Dr. Glenn M. Roberts Medical Associates *and in exchange for that money* that was owed to me there *I received* Dr. Glenn M. Roberts Medical Associates and I managed the corporation.

(Testimony of Glenn A. Roberts, September 30, 1986, transcript p. 11, lines 9–15).

We find this testimony, couched in coached legalese, to be less than credible.

First, Debtor's defense was predicated in the pleadings on the claim that nothing of value was transferred; therefore, no consideration was necessary. Second, the defense of "prior services rendered" was raised for the first time at trial, and only after Debtor's "no value-no consideration" argument appeared doomed. Last, while Glenn A. claimed that the transfer was for prior services, no documents or agreements containing such a bargain have been produced. In order for this testimony to be given credence, more substantial evidence would be necessary.

Based upon the foregoing evidence, we find that the corporation was transferred by Debtor for less than fair consideration, at a time when he was insolvent, in violation of 11 U.S.A. § 548(a)(2) and 39 P.S. § 354.

## IV. Complaint By The Trustee For Turnover Of Property Fraudulently Transferred and/or Concealed By Debtor

This action was brought by the Trustee to recover substantial items of property falling into the following categories:

a) property transferred from Debtor's individual name to entireties name;

b) entireties property concealed from the bankruptcy estate; and

c) property belonging to Debtor individually and concealed from creditors.

We have previously stated that any property not scheduled as an asset of the estate and deliberately concealed cannot now be exempted. The Trustee asks that we further direct Debtor to turn over all such property to the estate and provide an accounting of same.

■ A. As in Section III, the Trustee seeks to obtain control over assets through assertions of fraudulent convey-

---

**9.** As stated in Section I of this Opinion, Debtor also stated that two vehicles, titled to him and his wife, were purchased with corporate assets and belonged to the corporation. Their total value was scheduled at $6,800.00.

**10.** We should also note that the acknowledgement letter from Weirton Osteopathic Hospital

to Debtor is dated November 21, 1984, almost six (6) full months after the transfer of the practice to his sons. No explanation has been provided as to how the Debtor was able to donate equipment which no longer belonged to him.

ances pursuant to 11 U.S.C. § 548 and 39 P.S. §§ 354 and 357. This Court has previously considered various factors which indicate fraudulent intent. These "badges of fraud" include:

a) absence of or negligible consideration;

b) value removed from the estate;

c) timing of the transfer;

d) debtor's relationship to transferee; and

e) debtor's solvency at the time of transfer.

*In re Compton,* 70 B.R. 60 (Bankr.W.D.Pa. 1987); *Matter of Brooks, supra.* We have also held as a presumption that a transfer to a close relative for little or no consideration is fraudulent. *See Compton, supra,* and *Brooks, supra.* Furthermore, a transfer by a debtor to his spouse, while he is insolvent, and while he continues to use and enjoy said property, is a classic indication of fraud. *See In re Kaiser,* 722 F.2d 1574 (2nd Cir.1983).

Pennsylvania supports such a finding. *Taylor v. Kaufhold,* 379 Pa. 191, 108 A.2d 713, 717 (1954) ("... a husband cannot put his own assets beyond the reach of his creditors by creating an estate by the entireties or by putting his property in his wife's name.")

The case at bar is substantially similar to the case of *In re Ford,* 53 B.R. 444 (W.D. Va.1984), *aff'd* 773 F.2d 52 (4th Cir.1985), wherein a debtor claimed that a piece of property transferred by his parents to him individually was done mistakenly, and should have been transferred to both him and his wife as tenants by the entireties. Seven months after the initial transfer, debtor "corrected" the mistake. Coincidentally, he "found" this error on the day following the entry of a $20,000.00 state court judgment against him individually.

▮ In the case at bar, the following items are fraudulent conveyances under this legal analysis:

1) *528 Shares of Laurel National Bank Stock*

These shares were originally owned by Debtor individually. They were sold on October 4, 1984, after the District Court found Debtor liable, but ten (10) days prior to the entry of the $1.6 million judgment. On that same day 528 shares of Laurel National Bank stock were purchased by an entireties account in the names of Dr. Glenn M. and E. Jean Roberts. On January 1, 1985, Laurel National Bank was acquired by B.T. Financial Corp., resulting in a stock exchange of 1:45–1 and a cash per share payment.

2) *10,000 Shares of Corporate Investment Corporation Class A Stock*

On September 7, 1976 a certificate for 1,000 shares was issued to Glenn M. Roberts and E. Jean Roberts as tenants by the entireties; on that same date a certificate for 3,000 shares was issued to Glenn M. Roberts, individually. On November 15, 1979 a certificate for 500 shares was issued by Glenn M. Roberts and E. Jean Roberts as tenants by the entireties; on that same date a certificate for 1,500 shares was issued to Glenn M. Roberts, individually. An additional 1,000 shares held by the entireties and 3,000 shares held by the Debtor individually were purchased at an earlier time; however, the certificates evidencing same were lost. On October 22, 1984, eight (8) days subsequent to the entry of the $1.6 million judgment, the first 6,000 shares were transferred to a new certificate in the names of Glenn M. Roberts and E. Jean Roberts as joint tenants; thereafter, on December 10, 1984, a replacement certificate for the "lost" 4,000 shares was issued to Glenn M. Roberts and E. Jean Roberts.[11]

3) *Cash Value of Two Corporate Life Insurance Policies*

Debtor owned two life insurance policies through Corporate Life Insurance Company. These policies were taken

---

**11.** Not only was this a fraudulent transfer, but as is discussed, *supra,* the transfer from entireties to joint tenancy made at least one half of the joint asset the Debtor's individual, attachable property.

out on November 1, 1977. On October 31, 1984, these policies, having a then-present cash value of $38,330.47, were transferred into an annuity held by both Dr. Glenn M. and E. Jean Roberts.

4) *Thompson Property*

Debtor owned an 80–acre parcel of land. Debtor's name was the only name listed on the deed, although at trial, Debtor claims he and his wife owned one-half and another couple owned the other one-half. On October 2, 1984, just twelve (12) days before the final judgment, Debtor "found" his mistake and "corrected" the deed from his individual name to his and his wife's names, in consideration whereof he received $1.00.[12]

5) *Tax Exempt Bonds and Cash Held In Thompson McKinnon Account*

As of November 25, 1983, Debtor individually owned $40,000.00 in tax exempt bonds held by Thompson McKinnon. By September 25, 1984, Debtor had accumulated an additional $6,226.05 in said account. Between September 4 and 28, 1984, Debtor transferred all $46,226.05 into an entireties account held by the same brokerage concern.

6) *The Reserve Fund Inc.*

Debtor possessed two separate Reserve Fund accounts. The 1984 IRS 1099 Form shows Debtor listed as the individual owner of both funds. It appears from the "recipient identifying number" that one fund, No. T–25–0001319, was and is a Medical Associates asset.[13] The other account, identified by Debtor's social security number, was transferred from Debtor's individual name to entireties name after December 31, 1984 and before December 31, 1985. This fund was not listed on Debtor's original or Amended Schedules.

7) *Moneytree Account*

Debtor, along with his two brothers, was a named party to an account at the First National Bank & Trust Co. of Washington, PA. The parties to this action represent that this account contained the assets of the decedent estate of Debtor's mother. On October 1, 1984, less than two (2) weeks prior to the entry of the money judgment, a check for the total amount in the account, $17,765.00, was written to said bank and was used to open an identical account, save one important factor— Debtor's name was not on the new account; rather, his wife's name was now the primary signatory.

These transfers to the entireties estate, by Debtor, for little or no consideration, in the wake of a staggering money judgment, present convincing evidence of fraudulent intent. These transfers are avoided and Debtor will be ordered to turn over this property to the Trustee for administration.

**B.** Certain of the properties sought by the Trustee are claimed by Debtor to have been entireties property for over one year prior to the filing of the bankruptcy. Many of these properties are not truly entireties; as we stated *supra,* if a husband and wife choose a form of tenancy other than entireties, they are entitled to do so. *Brenner v. Sukenik, supra; Heatter v. Lucas, supra.* The following items are so classified:

1) *Nu–Veen Tax Exempt Bond Fund*

Debtor holds this fund with his wife as joint tenants, not as tenants by the entireties. This $3,600.16 fund (as of January 15, 1985) was not listed on either Debtor's original or Amended Schedules.

2) *JLG Industries Stock*

Debtor claims ownership of 500 shares of JLG stock as evidenced by a certificate dated March 7, 1985. Said certifi-

---

**12.** No testimony was offered as to why the property was not transferred to include the asserted ownership interests of the other couple. If indeed this was a "correction" attempt, it would seem that an *accurate* correction would be in order.

**13.** While the parties claim that the corporation had no assets on the date of transfer, May 31, 1984, the 1099 Form discussed above shows dividends of $464.76, indicating a substantial principal amount.

cate identifies the owners as Glenn M. Roberts and E. Jean Roberts as joint tenants. This does not constitute entireties property.[14]

■ Certain of the property listed is admittedly entireties in nature. However, these items are not exemptable; said exemptions have been disallowed due to their original concealment. *Redmond v. Tuttle, supra; Matter of Doan, supra.* These properties include:

1) *Burgettstown Hotel*

Debtor owns the Burgettstown Hotel with his wife by the entireties; however, said asset, valued at over $40,000.00, was not listed on Debtor's original Schedules, and appeared for the first time of record in Debtor's Motion to Amend Schedules, filed five (5) months after the original petition.

2) *28 Whitaker Avenue*

Debtor owns his residence with his wife, by the entireties; again, said asset, valued at over $60,000.00, was omitted from the original Schedules and not listed until the Motion To Amend was filed. Additionally, Debtor valued said property at $80,000.00 for fire insurance purposes.

3) *Debt Owed By Barbara Mercer*

Debtor and his wife sold property to Barbara Mercer and took back the mortgage on same. While the property is entireties, it was not listed until the creditors' interrogation caused Debtor's Motion to Amend.

While the estate has no present ability to attach these assets, we find that any interest of Debtor in these assets now belongs to the estate.

**C.** Pursuant to § 541 of the Bankruptcy Code, and with some exceptions not relevant herein, the filing of a bankruptcy petition transfers all of the debtor's legal and equitable interest in property to the bankruptcy estate, to be administered by the trustee. Debtor is charged therefore with the turnover and accounting of the following additional property:

1) *Stocks and Bonds Dealt Through Parker Hunter, Inc.*

Said bonds were delivered to Debtor on July 19, 1984. On the following day, July 20, 1984, Debtor purchased $15,000.00 additional of these bonds. On July 30, 1984, Debtor received:

a. *MCI Communications*—Debtor owned 1200 shares of MCI in his individual name. Parker Hunter's records indicate that the certificates representing the 1200 shares of MCI were delivered to the customer (Debtor) on July 18, 1984. At trial, Debtor responded to questioning about these shares by stating that he was unaware of their whereabouts, asserting they were still in the broker's possession, three (3) years after delivery. Debtor does not lease a safe deposit box and admits to understanding that such certificates are bearer paper and easily negotiable.

b. *Armstrong School District Bonds* —On July 19, 1984, Debtor in his individual capacity, owned $35,000.00 worth of these tax-free municipal bonds. On July 19th, Parker Hunter's records indicate delivery of the $35,000.00 bond. Thereafter, on July 20, 1984, Debtor returned $15,000.00 of said bond to the broker. On July 30, 1984, Debtor took delivery of the remaining $15,000.00 bond. Debtor does not recall receiving either delivery, nor does he have any idea as to the whereabouts of these bonds or their cash equivalent.

c. *Scranton–Lackawanna PA Health & Welfare Authority Bond*— Debtor owned $5,000.00 of tax-free municipal bonds in his name. On July 19, 1984, Debtor took delivery of same from Parker Hunter. Debtor now asserts he has no recollection of taking said delivery, nor can he presently account for the whereabouts of this highly negotiable bond.

---

**14.** Originally Debtor claimed that this certificate was a replacement issue. Whether they realized this was suspect is not clear. However, later there was indication that this certificate repre- sented a dividend split. If in fact this were true, Debtor should have more than 500 shares. This has yet to be resolved by either party.

370

d. *Western Wayne PA Bond* —Debtor individually owned this $5,000.00 tax-free municipal bond. On July 19, 1984, Debtor took delivery of same from Parker Hunter; however, he does not remember same nor does he presently know where to find this negotiable document.

2) *Westgate Terrace Associates*

Debtor claimed he and his wife owned a part interest in this association, asserting it to be held by the entireties. The Partnership Tax Return schedules for 1984 indicate that Debtor and his wife were each individual partners, not one entireties partner.

3) *Cash Equivalent Fund Inc.*

Debtor individually owned an interest, the exact amount of which is presently unknown. Debtor did not list this item on his original or Amended Schedules.[15]

4) *Francis E. Brunner Partnership*

Debtor holds an individual fifty percent (50%) interest as a general partner. The value of said asset is presently unknown. The partnership was not listed on Debtor's original or Amended Schedules.

5) *Nationwide Insurance Tax Sheltered Annuity*

This annuity, in Debtor's individual name, took effect on December 1, 1981. As of January 1, 1985, it was valued at $13,268.08. This asset was not listed on either the original or Amended Schedules.

6) *Manufacturer's Life Insurance Policy*

Debtor was insured under said paid-up policy. The maturity date was December 5, 1987, at which time it had a value of $6,884.57. This asset was not listed on either set of Debtor's Schedules.

7) *Estate of Debtor's Father*

The Schedule of Distribution as filed with the Orphan's Court of Washington County, indicates a loan to the estate owed to Debtor in the sum of $10,986.00. Debtor did not list this sum on his original or Amended Schedules.[16]

8) *Medical Practice Debt*

Pursuant to the statement of financial position of the medical corporation for the period ending March 31, 1984, as prepared by Debtor's accountant, the statement of liabilities indicates a loan due and owing of $6,855.00. Said amount remained due and owing on the financial statement for March 31, 1985. This debt owing to Debtor is not listed on Debtor's original or Amended Schedules.

9) *Income Tax Refund*

Debtor believed he was entitled to a refund on his 1984 federal income taxes. This item was not listed on his original or Amended Schedules.[17]

10) *Bonds Dealt Through Butcher & Singer, Inc.*

As of October 28, 1983, Debtor held several bonds, in his individual capacity, through Butcher & Singer, Inc. to-wit:

a) 5,000 Shenandoah Valley School District

b) 5,000 Penn Hills Municipality

c) 10,000 Philadelphia PA Authority

d) 20,000 Westmoreland County PA Housing Authority

On November 21, 1983, Debtor took delivery of all of the above. Debtor does not know the whereabouts of these negotiable assets.

All of these transfers and disappearances occurred after the filing of the class action litigation against Debtor and others in their individual capacities, and as fiduciaries of

15. Debtor's Motion To Amend Schedules was denied *supra;* however, we indicate as above to show when items were uncovered by the Trustee and when ownership was admitted.

16. The $33,000.00 amount listed as received by Debtor from his father's estate was later found to have been paid in error. Debtor *did* find sufficient assets to repay this sum to the decedent estate.

17. It was later adduced at trial that Debtor was not entitled to said refund and in fact that said taxes were due and owing.

the Crescent companies. Many occurred between the date of judgment as to liability, April 19, 1984, and the date of final judgment as to damages, October 10, 1984. Still others occurred on the heels of the $1.6 million judgment. Debtor had no memory of taking delivery of nine (9) substantial stock or bond issues, and claims no knowledge of their whereabouts. The Court finds that these above-mentioned assets have been purposefully and wilfully concealed from the Trustee and will order the Debtor to turn them over to the Trustee or properly account for their whereabouts.

## V. Trustee's Complaint For Turnover Of Joint Venture Rental Payments As Subject Of Fraudulent Conveyance

In 1971 Debtor incorporated his medical practice. At the same time he "gifted" the medical equipment, valued on the corporate books at $6,200.00, to his three minor children; the corporation then leased said equipment from the children for an annual rental of $6,000.00.[18] We have been provided no documentation evidencing said transfer. All parties testified that no written lease has even been executed.

As a result of the death of another doctor in the geographic area, additional equipment was transferred to the children in 1972. Decedent's wife gave this equipment in exchange for hauling of same and payment of the remaining 2–3 rental payments on decedent's office lease. Testimony offered indicates that Debtor provided the funds to make the lease payments. No one recalled who paid for the moving van and the additional manpower; the children did acknowledge that they were in high school and college at the time. No one has provided the Court with any documents to show the gifting of this equipment to Debtor's children by either the decedent's wife or Debtor himself.

This equipment was also orally leased to the medical corporation. Although the testimony offered indicated this gift was substantial, *inter alia*, several rooms of office furniture and medical equipment, the annual rental of $6,000.00 remained unchanged.

One year later another local doctor discontinued his practice and transferred his equipment to Debtor's children for hauling of same and a small remuneration; no testimony was offered as to the funding for this transaction. There is no documentation from this doctor, his wife or Debtor identifying these rooms of furniture and equipment as gifts to the children. All of this additional equipment was again leased to the medical corporation; however, the $6,000.00 annual rental remained constant.

The final addition of "gifted" equipment occurred in 1975 or 1976, when another physician retired and benevolently turned over his furniture and equipment to Debtor's children in return for their removal of same. No documentation identifying this transfer as a gift are proffered. Again, this equipment was leased to the corporation. Remarkably, the rental payments remained $6,000.00 per year.

Since that addition in 1976, the corporation has acquired some equipment of its own; however, at trial, none of the doctors were able to clearly distinguish corporate owned equipment from that leased by Debtor.

It is also noteworthy that Defendants have provided no substantiation or corroboration of their self-serving testimony. There has been no attempt to submit affidavits, take depositions or present witnesses, such as the retired physicians or their spouses.

The parties testified that: 1) the annual rental payment for this conglomeration was $6,000.00, made at the end of each corporate fiscal year in May; and 2) this money was used for the children's college educations. Defendants' Exhibit F, a checkbook representing the children's account, was offered as substantiating evidence. Rather than substantiating the testimony, we found the following discrepancies:

---

**18.** Testimony elicited at trial shows that this transfer was conducted in order to reduce Debtor's taxable income, and increase his expenses while repositioning assets to fall into the children's lower tax bracket.

1) In 1971, the account was opened with a deposit of $900.00. During September, over one-half of that deposit was used for life insurance payments, one of which apparently covered E. Jean Roberts, Debtor's spouse. An additional $900.00 deposit was made, in part, to cover a $510.00 check to Bethany College. This is the ONLY reference to education in the entire checkbook register, and in fact, there is no actual evidence that this check was drawn for tuition or fees.

2) In 1972, deposits totaling $3,893.73 were made between January and October; during 1972, $2,862.19 was paid out in life insurance payments.

3) In 1973, only $2,700.00 was paid into the account; one-third in January and two-thirds in July. During that year, $1,587.52 was paid for life insurance and $804.50 was paid to an automobile dealership.

4) In 1974, only one deposit occurred, on January 31, in the sum of $1,800.00.

5) In 1975, deposits of $3,600.00 in January and $3,300.00 in July, were made; this is the first indication made in the checkbook register that these deposits represent equipment rentals. During 1975, the only payment from the account was $2,448.00 to another car dealership.

6) In 1976, additional deposits totaling $2,700.00 were made—$300.00 in January and $2,400.00 in November. During 1976, two checks were written—both to car dealerships: one in July for $2,300.00 and one in November for $2,236.00. No further withdrawals occurred until the account was closed in 1982.

7) In 1977, five (5) deposits totaling $2,873.40 were made—two on January 18th for $57.00 and $171.60, two on March 23rd for $184.50 and $60.00, and one in August for $2,400.00.

8) In December of 1978, one deposit of $2,400.00 was made.

9) In January of 1979, one deposit of $5,400.00 was made.

10) In 1980, two deposits were made—$5,400.00 in May and $3,600.00 in June.

11) In June of 1981, an additional $3,600.00 was deposited.[19]

An account in the name of RKCJG Joint Venture was opened on August 24, 1982. This account was created by Debtor's children for the benefit of Debtor's grandchildren, as the grandchildren were all minors. While the Joint Venture account represented the transfer of the right to "rental" payments from the children to the grandchildren, Debtor and his wife were and are the co-administrators and sole signatories to the account.[20] Therefore, Debtor and his wife controlled both the drawing of the rental checks by the lessee *and* the cashing of same by the lessor.

The first rental payment of $6,000.00 occurred on August 24, 1982, with the opening of the account. This check, while deposited in August, was drawn at the end of the corporate fiscal year—May 1982. Thereafter, in 1983, an additional check for $6,000.00 was deposited. Again, the check was drawn in May, and held for deposit until July. The next two rental checks, drawn in May of 1984 and May of 1985, were for $3,000.00 each. These checks were deposited to the rental account on October 22, 1984 and August 2, 1985. The 1986 rental check, also for $3,000.00, had not been deposited into the account by the time of trial. No testimony has been offered to explain the dramatic decrease in rental payments.

We find that this transaction was a sham from the onset. There is no rhyme nor reason to the pattern of rental payments, nor is there any substantiation of Defendants' self-serving testimony. No affida-

---

**19.** This account was closed on June 14, 1982, with a total balance of $29,730.31. The Court has not been apprised of the whereabouts of said funds.

**20.** There is no indication that Debtor's children complied with the Uniform Gift to Minors Act, 20 Pa.C.S.A. § 5301 *et. seq.* when transferring ownership of the medical equipment.

vits, depositions or trial testimony was provided to corroborate that of Doctors Glenn A. and Robert Roberts.

It is generally agreed that when a potential witness is available and appears to have special information relevant to the case, so that his testimony would not merely be cumulative, and where his relationship with one of the parties is such that the witness would ordinarily be expected to favor him, then if such party does not produce his testimony, the inference arises that it would have been unfavorable.

*General Electric Credit Corporation v. Aetna Casualty and Surety Company,* 437 Pa. 463, 477 n. 18, 263 A.2d 448, 456 n. 18 (1970), *quoted in Merling v. Commonwealth Department of Transportation,* 79 Pa.Cmwlth. 121, 468 A.2d 894 (1983).

The testimony offered to this Court misrepresented the facts, leading the Court to believe that annual rental payments of $6,000.00 were made every May, beginning in 1971 or 1972, and that these funds were used for the *children's education.* The documents show a haphazard pattern of deposits and a usage of said funds for items wholly unrelated to education. When the "ownership" of the equipment was transferred to the grandchildren, on the altruistic premise of furthering *their* educations, the existing pot of money, almost $30,000.00, was nowhere to be seen. Benevolence apparently has its limits.

Neither did the children/donors comply with the Uniform Gift to Minors Act in transferring ownership of the equipment to the grandchildren. We find the testimony and evidence presented by the defense to be contradictory and unreliable.

Far from showing that these rental payments were fair consideration, the totality of the evidence shows that the corporation and Debtor actually treated the equipment as their own, and the "rent" as a tax shelter. Furthermore, Defendants' claim of good faith in the withholding of rental payments for months before depositing them, is enigmatic at best. Rather, it indicates to this Court a mind-boggling pattern of manipulation and control of funds, perhaps in

breach of fiduciary duties, and a seriously deficient degree of arm's-length dealing.

This Court is not persuaded that this equipment belongs to anyone other than the corporation. We have previously found, *supra,* that the transfer of the corporation to Debtor's sons was a fraudulent conveyance, and therefore, avoided. Once Debtor became insolvent, any assets transferred to his grandchildren under the guise of "rental payments" became a fraudulent conveyance. The Joint Venture account will be directed to return and account for any and all "rent" payments made to it from Debtor and his wife, and/or the medical corporation, from April 19, 1984 forward.

## VI. Trustee's Complaint For Turnover Of Debtor's Interest In Pension Plan

Debtor, as a licensed osteopath, has practiced medicine since 1971 as an employee of Glenn M. Roberts Medical Associates; he is the sole shareholder and director of the corporation, and his wife is the only other officer. In 1977, the corporation created a pension plan pursuant to the Employee Retirement Income Security Act, 29 U.S.C.A. § 1001 *et. seq.* ("ERISA") and the Internal Revenue Code 26 U.S.C.A. § 401 *et. seq.* ("IRC"). This Plan was created by operation of a trust, with the corporation as Settlor, Debtor as Trustee, and the qualified corporate employees as beneficiaries. Pursuant to ERISA and the IRC, the pension plan contained provisions which prohibited the assignment or alienation of the interests accrued by the beneficiaries; contributions to the fund were made by the corporation, and the employee beneficiaries were permitted to make certain limited contributions as well. It was the Trustee's duty to oversee the plan and determine the appropriate investments. The Settlor, by vote of its Board of Directors, reserved the right to amend or terminate the pension trust.

The assets of the pension plan are in complete disarray. No one, not even the plan's accountant, was able to testify as to the values of the various plan assets. The tax information (Form 5500C) which must be filed every third year, have not been

submitted since 1978. Properties which supposedly belong to the pension plan are deeded to Debtor individually.

The Bankruptcy Trustee asserts that the pension plan must be turned over because it is property of the estate. The Trustee further contends that the pension plan is not exemptable by Debtor, because:

1) Debtor concealed this asset from his Schedules and acknowledged same only after the Trustee discovered it through interrogation; and

2) this is not the type of asset exempt from process under applicable state law.

Debtor argues that this asset was not listed on the original bankruptcy Schedules because be believed, and still does believe, that pursuant to § 541(c)(2) of the Code, the pension plan never became property of the estate, but was, retained for the benefit of Debtor. In the alternative, Debtor argues that if the pension plan is property of the estate, it is exemptable from the estate pursuant to Pennsylvania State Exemption Law, 42 Pa.C.S.A. § 8124.[21]

Section 541(a) provides that all legal and equitable interests of the debtor in all tangible and intangible property constitute property of the estate. This section has been consistently interpreted in very broad terms. *In re Rigden*, 795 F.2d 727 (9th Cir.1986) (right of redemption subsequent to foreclosure sale); *Matter of All–Way Services, Inc.*, 73 B.R. 556 (Bankr.E.D.Wis. 1987) (causes of action); *Matter of Hawkeye Chemical Company*, 71 B.R. 315 (Bankr.S.D. Iowa 1987) (proceeds of fire insurance policy); *In re Everetts*, 71 B.R. 110 (Bankr.D.Colo.1987) (bequest received shortly after filing of petition); *In re Hardage*, 69 B.R. 681 (Bankr.N.D.Tex. 1987) (crops in existence on date of filing); *In re 48th Street Steakhouse, Inc.*, 61 B.R. 182 (Bankr.S.D.N.Y.1986) (leasehold or mere possessory interest in property).

Section 541(c)(2) provides the exception to this rule, when it states:

2) A restriction on the transfer of a beneficial interest of the debtor in a trust that is enforceable under *applicable nonbankruptcy law* is enforceable in a case under this title. (Emphasis added.)

The courts discussing this subsection have generally stated that the phrase "applicable nonbankruptcy law" refers only to state laws concerning spendthrift trusts. *In re Lichstrahl*, 750 F.2d 1488 (11th Cir. 1985); *In re Graham*, 726 F.2d 1268 (8th Cir.1983). These decisions were reached after profound and thorough analysis of the legislative history and comparison with the Bankruptcy Act of 1898. *See* H.R. Rep. 95–595, 95th Cong., 2d Sess. 369 (1977), U.S.Code Cong & Admin.News 1978, pp. 5787, 6325, which states in pertinent part:

Paragraph (2) of subsection (c), however, preserves restrictions on transfer of a spendthrift trust to the extent that the restriction is enforceable under applicable nonbankruptcy law.

*See also, Id.* at 176, U.S.Code Cong. & Admin.News 1978, p. 6136, wherein it states:

The bill also continues over the exclusion from property of the estate of the debtor's interest in a spendthrift trust to the extent said trust is protected from creditors *under applicable State law.* (Emphasis added.)

■ Consequently, an ERISA qualified pension plan containing provisions prohibiting alienation and assignment is excluded from the estate only if said plan constitutes a spendthrift trust under Pennsylvania law. A spendthrift trust is generally created when the settlor includes a provision prohibiting anticipatory alienations and attachments by the creditors of the beneficiary. *Riverside Trust Co. v. Twitchell*, 342 Pa. 558, 20 A.2d 768 (1941); *In re Keeler's Estate*, 334 Pa. 225, 3 A.2d 413 (1939); *Wilson v. United States*, 372 F.2d 232 (3rd Cir.1967).

---

**21.** Debtor's individual retirement accounts ("IRAs") are exempt pursuant to 42 Pa.C.S.A. § 8124(b)(1)(viii), to the extend "actually excluded or deducted as retirement funding for federal income tax purposes." *Marine Midland Bank v. Sunbelt Inc.*, 532 F.Supp. 728 (W.D.Pa. 1982). *See also, Industrial Valley Bank v. Rosenfield*, 37 D & C 3d 621 (Phila.1985).

The law in Pennsylvania pertaining to spendthrift trusts does have exceptions, one of which holds that a settlor cannot create a trust of his own property in his own favor, and by naming himself as trustee, thwart his creditors' attempts to attach the *res. In re Mogridge's Estate*, 342 Pa. 308, 20 A.2d 307 (1941); *C.I.T. Corporation v. Flint*, 333 Pa. 350, 5 A.2d 126 (1939); *Hahn v. Hutchinson*, 159 Pa.St. 133, 28 A. 167 (1893). Such a conveyance would be fraudulent. *Nolan v. Nolan*, 218 Pa. 135, 67 A. 52 (1907); *Ghormley v. Smith*, 139 Pa.St. 584, 21 A. 135 (1891). In fact, in order to maintain the integrity of such a trust as to subsequent creditors, the settlor must show that he has no further ownership in or control over the trust *res. Morton v. Morton*, 394 Pa. 402, 147 A.2d 150 (1959); *Nolan, supra*. To allow otherwise would fly in the face of solid public policy: a party cannot be permitted to enjoy all the benefits of ownership, while divesting both himself and his property of all of the attendant burdens. *In re Mogridge's Estate, supra; Rienzi v. Goodin*, 249 Pa. 546, 95 A. 259 (1915). As stated in the principal case of *Mackason's Appeal*, 42 Pa. 330 (1862):

> Can the owner of property so dispose of it, for his own use, benefit, and support, as to put it beyond the reach of liability for his future debts; he being and continuing *sui juris*, and there appearing to be no reason therefore, excepting to withdraw it from such liability and thus retain the temporal ownership without its incidents? This would be a startling proposition to affirm. It would revolutionize the credit system entirely, destroy all faith in the apparent ownership of property, and repeal all out statutes and decisions against frauds.

█ The pension plan in existence at the time of the bankruptcy filing was not a valid spendthrift trust pursuant to Pennsylvania law. While the pension plan did prohibit assignment and alienation by the Debtor/beneficiary, his interest in the plan as the controlling officer and sole director of his Settlor/professional corporation, *and* his additional position as Trustee of the *res*, gave him absolute dominion and control

over the pension plan and fund. This is precisely the type of fraudulent activity contemplated and arrested by the Pennsylvania Supreme Court in *Mackason's Appeal, supra.* Several other federal courts have made similar determinations; *See In re Lichstrahl, supra;* (Florida); *Matter of Goff*, 706 F.2d 574 (5th Cir.1983); *In re Graham*, 24 B.R. 305 (Bankr.N.D.Iowa), *aff'd* 726 F.2d 1268 (8th Cir.1984); *Matter of Jones*, 43 B.R. 1002 (N.D.Ind.1984); *In re Brackett*, 54 B.R. 57 (Bankr.D.N.M. 1985); *In re O'Brien*, 50 B.R. 67 (Bankr.E. D.Va.1985); *In re Clark*, 18 B.R. 824 (Bankr.E.D.Tenn.1982).

█ Debtor has argued in the alternative that the pension plan is exempt under Pennsylvania statutory law, particularly 42 Pa.C.S.A. § 8124(b)(1)(vii), which states:

**§ 8124. Exemption of particular property**

(b) Retirement funds and accounts—

. . . .

(1) Except as provided in paragraph (2), the following money or other property of the judgment debtor shall be exempt from attachment or execution on a judgment;

. . . .

(vii) Any pension or annuity, whether by way of a gratuity or otherwise, granted or paid by any private corporation or employer to a retired employee under a plan or contract which provides that the pension or annuity shall not be assignable.

The Plaintiff asserts that this exemption applies only to "retired employees", and as Debtor was not retired as of the date of the bankruptcy filing, this statutory exemption is not applicable. Debtor counters that the alternate verbage "granted or paid" refers to any employee having an entitlement to funds upon retirement. We are not guided by any legislative history in defining "granted" as it is used in this subsection. However, we do not believe that a lexicography or generic legal interpretation is appropriate. In reviewing the statute itself, we find that "granted" relates to "a retired employee". Similarly, there is a significant

relationship between "granted" and "paid"; the existence of the disjunctive rules out mere redundancy. We believe that "granted" is a stage beyond vesting, while remaining a stage before payment. There has been no grant to a retired employee. There has been no payment to a retired employee. Indeed, *there is no retired employee. Expressio unius est esclusio alterius.* The exemption of the pension plan pursuant to 42 Pa.C.S.A. § 8124(b)(1)(vii) will be denied.

Additionally, we stated in Section II, *supra,* that Debtor's original concealment of the very existence of this pension plan, together with his subsequent attempt to amend and exempt upon exposure by the Trustee, is sufficient in and of itself to deny Debtor any entitlement thereto.

As a side issue, Debtor asserts that he was not the sole beneficiary of this pension plan: his son, Robert L. Roberts (hereinafter "Dr. Robert"), a doctor of chiropractic medicine, also claims an interest therein. We are disinclined to agree. Dr. Robert's testimony is rendered completely invalid by substantial recurring inconsistencies. Dr. Robert testified at deposition that he worked for the medical corporation four (4) days per week, two and one-half (2½) hours each day, or a total of ten (10) hours weekly, and that the corporation had only one office from 1983 forward. However, at trial, just three weeks later, the number of hours suddenly grew to eleven (11) daily, four (4) days per week, and 48-hours "on call" status, including house calls, every weekend. Dr. Robert also stated that he spent the fifth weekday morning performing additional services for the corporation at another office. Dr. Robert explained these discrepancies by stating that he misunderstood the Trustee's questioning at the deposition. After reading the transcript of same, we are convinced that Dr. Robert understood the questions, asked and answered several times over, and knew they related to his qualifications as a pension plan beneficiary.

Dr. Robert further testified that his annual salary from the corporation, for performing over 40 hours weekly, was $15,000.00. However, he further testified that his own practice, to which he devoted about 15 hours weekly, paid him an annual salary of $25,000.00.

Additionally, Dr. Robert feigned total ignorance of corporate decision making when questioned at his deposition. Three weeks later, at trial, he was able to discuss, with great detail, the time of meetings and the parties in attendance, as well as the subjects discussed.

Our first-hand observation of Dr. Robert's demeanor at trial cements our finding of no credibility. He alternately appeared flippant, arrogant, and imbecilic. His claims of ignorance as to many issues are inconceivable, when we know that we are dealing with a man who possesses such intellect that he was able to complete three years of college studies while still in high school, has completed all but 2–3 courses toward a Masters Degree in Education, and is a licensed chiropractor.

Based upon the foregoing analysis, we find that Debtor has not proved that Dr. Robert performed over 1,000 hours of service to the corporation in any given year since 1982.[22]

Therefore, the entire pension fund, as it existed on March 15, 1985, shall be turned over to the Trustee, along with any interest accruing on the prepetition plan assets. We also will order Debtor to provide the Trustee with a complete and accurate accounting of the pension fund assets.

## VII. Creditors' Objections To The Dischargeability Of Certain Debt

The class action judgment creditors brought this adversary proceeding against Debtor objecting to the discharge of their $1.6 million award obtained by summary judgment in the U.S. District Court for the Western District of Pennsylvania, and affirmed by the Third Circuit Court of Appeals. That judgment arose as a result of

**22.** This was the first year in which Dr. Robert met the pension plan age requirement for qualified beneficiaries.

various fraudulent acts by Debtor, including securities and mail fraud, both individually and with others, in his capacity as fifty percent (50%) owner of the Crescent companies. These creditors object to the discharge of the debt owed them pursuant to subsections (2)(A), (4), and (6) of 11 U.S.C. § 523(a).

Exceptions to the dischargeability of certain debts is strictly construed in Debtor's favor, effectuating the Bankruptcy Code's "fresh start" policy. The objector must establish every element of such a claim by clear and convincing evidence. *In re Kimzey,* 761 F.2d 421 (7th Cir.1985); *In re Linn,* 38 B.R. 762 (9th Cir. BAP 1984); *In re Kreps,* 700 F.2d 372 (7th Cir.1983).

Section 523(a)(2)(A) states as follows:

§ 523. Exceptions to discharge.

(a) A discharge under section 727, .... of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

In order to prevail in an action under § 523(a)(2)(A), Plaintiff must prove that:

1) the debtor made the representations;

2) at the time he made them, he knew they were false, or he made them with reckless disregard for the truth;

3) he made them with the intention and purpose of deceiving the creditor;

4) the creditor relied on said representations; and

5) the creditor sustained the alleged loss and damage as the proximate result of the representations having been made.

*In re Kimzey, supra; In re DiPierro,* 69 B.R. 279 (Bankr.W.D.Pa.1987); *In re Hammill,* 61 B.R. 555 (Bankr.E.D.Pa.1986).

The Trustee contends that this Court is collaterally estopped from deciding these elements, based upon the District Court and Third Circuit opinions in the Crescent-related litigation.

Collateral estoppel, like the related doctrine of *res judicata,* has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation.

*Parklane Hosiery Company, Inc. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed. 2d 552 (1979).

■ In a bankruptcy context, specifically in the case of a dischargeability determination, collateral estoppel is only appropriate when:

1) the issue sought to be precluded is the same as that involved in the prior action;

2) the issue was actually litigated;

3) a valid, final judgment was entered; and

4) the determination was essential to the prior judgment.

*In re Ross,* 602 F.2d 604 (3rd Cir.1979); *Matter of McMillan,* 579 F.2d 289 (3rd Cir.1978); *Haize v. Hanover Insurance Co.,* 536 F.2d 576 (3rd Cir.1976); *In re DiPierro, supra.*

■ It is established from the records of the prior litigation, and the decisions of the District and Appellate courts, that fraud and false representations, in connection with Plaintiff/Investors, were central issues in those proceedings, and that these actions were actually litigated, resulting in summary judgment orders. Findings of fraud and fraudulent misrepresentation were essential to the entry of said summary judgments. As no appeal was taken from the Third Circuit decision, the judgment is final and valid. Based on the record, therefore, we find that Debtor's activities in relation to the class of judgment creditors were of the type anticipated when the drafters enacted § 523(a)(2)(A) and their judgment will be held nondischargeable.

Plaintiffs also contend that the debt owed to them should be held nondischargeable pursuant to § 523(a)(4) which states:

(a) A discharge under § 727 ... of this title does not discharge an individual debtor from any debt—

> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

To establish dischargeability pursuant to § 523(a)(4), Plaintiffs must prove that:

1) the debtor was acting in a fiduciary capacity; and

2) the debt was created by the debtor's fraud or defalcation; or that there was embezzlement or larceny.

*In re Reilly,* 68 B.R. 545 (Bankr.D.Haw. 1986); *In re Overmyer* 52 B.R. 111 (Bankr. S.D.N.Y.1985).

Directors and dominant or controlling shareholders are fiduciaries. *Superintendant of Insurance of the State of New York v. Banker's Life and Casualty Company,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Both the District Court and the Third Circuit Court Of Appeals found Debtor to be a "controlling person" of the Crescent conglomerate. Debtor has admitted to being the 50% owner and a director of same. Debtor committed the fraud, described previously, while acting in a fiduciary capacity. Additionally, Debtor took $125,000.00 of corporate funds subsequent to the Crescent bankruptcy filings, said funds being the property of Crescent's creditors. This constitutes a defalcation at the very least, and may, in fact, reach the level of embezzlement or larceny.[23] Debtor pled guilty to bankruptcy fraud, 18 U.S.C. § 152, in connection therewith, and was fined $5,000.00, ordered to pay $25,000.00 in restitution, and sentenced to serve five (5) years of probation.

Therefore, the $1.6 million debt is nondischargeable pursuant to § 523(a)(4).

Section 523(a)(6) states as follows:

(a) a discharge under section 727, .... does not discharge an individual debtor from any debt—

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

▮ The term "willful" means "deliberate or intentional" and "malicious" means "wrongful and without just cause or excuse, even in the absence of personal hatred, spite or ill will." *In re Condict,* 71 B.R. 485 (Bankr.N.D.Ill.1987). For the debtor's acts to be malicious, all that is required is that the debtor have actual knowledge that his act will harm another and proceed in the face of same. *Matter of Cullen,* 71 B.R. 274 (Bankr.W.D.Wis.1987). Said knowledge may be inferred from Debtor's business experience.

▮ It is clear from the record of the District and Appellate litigation that Debtor knew that his acts had the effect of depriving others of property rightfully belonging to them—and yet, he continued to allow and take part in the ravage of the Crescent companies, leaving the creditors with nothing but a carcass picked clean by vultures. The debt owed to these judgment creditors is not dischargeable pursuant to § 523(a)(6).

## VIII. Judgment Creditors' Objection To Debtor's Discharge Pursuant To 11 U.S.C. § 727(a)

As we have stated in *Matter of Brooks,* 58 B.R. at 464:

> Section 727 of the Bankruptcy Code is the core of the fresh start provision in bankruptcy law, permitting the *honest* debtor to receive a new start in life free of the manacles of debt. (Emphasis added.)

Section 727, like § 523, is to be liberally construed in favor of Debtor, and the burden of proving the objection is on Plaintiff. The evidence must be such that, given the totality of all facts and circumstances, the Court determines that "the debtor has violated the spirit of the bankruptcy laws and should therefore be denied the privilege of eliminating the legal obligation of his

---

**23.** Defalcation is the misappropriation by a debtor of funds entrusted to him. Embezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted. Larceny is the fraudulent and wrongful taking and carrying away of property of another with intent to convert said property to his own use without the owner's consent.

debts." *In re Cohen,* 47 B.R. 871, 874 (Bankr.S.D.Fla.1985). *See also, In re Shebel,* 54 B.R. 199 (Bankr.D.Vt.1985); *In re Cycle Accounting Services,* 43 B.R. 264 (Bankr.E.D.Tenn.1984).

However, "[O]nce a creditor has carried the burden of showing that a debt falls within the fraud exception to discharge and, therefore, has demonstrated the debtor's dishonesty as to that debt ... the debtor 'is no longer entitled to the benefit of debtor rehabilitation policy considerations'." *In re Ophaug,* 827 F.2d 340, 343 (8th Cir.1987); *In re Hunter,* 771 F.2d 1126, 1130 (8th Cir.1985); *In re Wilson,* 12 B.R. 363, 370 (Bankr.M.D.Tenn.1981).

The creditors have objected to Debtor's discharge on six different counts; they will be discussed *seriatum.*

Section 727(a)(2)(A) states:

(a) The court shall grant the debtor a discharge, unless—

(2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition;

To meet their burden of proof, the creditors must show that:

1) the debtor transferred or concealed property;

2) said property belonged to the debtor;

3) the transfer or concealment occurred within one year of the bankruptcy filing; and

4) the debtor executed the transfer or concealment with the intent to hinder, delay or defraud a creditor.

*Brooks, supra; In re Shumate,* 55 B.R. 489 (Bankr.W.D.Va.1985); *In re Gordley,* 38 B.R. 630 (Bankr.S.D.Ohio 1984).

The most difficult of the elements to prove is Debtor's intent to hinder, delay or defraud his creditors. Since it is clear that a debtor will not voluntarily testify that his intent was fraudulent, the court can deduce same from the facts and circumstances of the case. *Brooks, supra; In re Factory Tire Distributors, Inc., supra; In re Ingle,* 70 B.R. 979 (Bankr.E.D.N.C.1987). These "badges of fraud" include:

1) little or no consideration for the transfer;

2) timing of the transfer;

3) relationship of the parties to the transfer;

4) solvency of the debtor at the time of transfer;

5) concealment of the transfer; and

6) pendency of a collection lawsuit.

*Brooks, supra; In re Peery,* 40 B.R. 811 (Bankr.M.D.Tenn.1984); *In re Rubin,* 12 B.R. 436 (Bankr.S.D.N.Y.1981).

In the case at bar, we have the following transactions raised by the creditors:

1) Within one year prior to the filing of his bankruptcy petition, Debtor was found civilly liable for over $1.6 million of debt. Less than two months after said judgment, Debtor transferred the ownership of his medical practice to his son or sons in return for no consideration. The medical corporation was found by this Court to have more than nominal value. This transfer was not listed on Debtor's Schedules.

2) Between the date of the District Court judgment in April of 1984, and Debtor's filing on March 15, 1985, Debtor attempted to transfer substantial assets, in the form of stocks, bonds, real estate, bank accounts and insurance policies from individual to entireties name. No consideration was given, nor were these transfers listed on Debtor's Schedules.

3) Within one year prior to the bankruptcy filing, Debtor made "rental" payments to a bank account, supposedly set aside for his grandchildren, but over which he and his wife maintained complete dominion and control. There was no consideration given to Debtor in return for said payments, since we

determined that Debtor's grandchildren were not the lessors of the equipment.

Each of the above-mentioned actions manifested most or all of the recited badges of fraud needed to prove Debtor's intent. As such, Plaintiffs have met their burden pursuant to § 727(a)(2)(A) and Debtor's discharge will be denied.

■ The creditors also seek to deny Debtor's discharge pursuant to § 727(a)(3), which states in pertinent part:

(a) The court shall grant the debtor a discharge, unless—

(3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;

This section compels Debtor to maintain his financial affairs in a good faith manner. The circumstances of each individual case will determine whether the records are deemed adequate. In all cases, however, the records must sufficiently reflect the debtor's finances, adhering "to a course of conduct that long ago was simply called 'true and plain dealing'." *In re Johnson*, 54 B.R. 582, 583 (Bankr.S.D.Tex.1985), *quoted in In re Shapiro*, 59 B.R. 844 (Bankr.E.D.N.Y.1986). *See also, In re Brown*, 56 B.R. 63 (Bankr.D.N.H.1985).

In the case at bar, Debtor fails to comply with this section in three specific instances:

1) Debtor claims to have lost certain stock certificates representing 4,000 shares of Corporate Investment Corporation; 1,000 in entireties names, and 3,000 in Debtor's individual name. It is unclear when these certificates were lost; however, on October 22, 1984, eight days subsequent to the entry of the $1.6 million judgment, renewal shares were issued to Debtor and his wife as joint tenants, in an effort to create exempt property.

2) Debtor's financial records are in complete disarray. Debtor claims that many of the assets listing him as the individual owner should in fact list him as the Trustee of the pension fund. Many of the pension plan assets are not supported by documentation at all.

3) Debtor is unable to account for multitudenous tax-exempt bonds. While the brokerage house records indicate that Debtor took delivery of these instruments, he claims no recollection of same. Debtor cannot explain the whereabouts of these negotiable instruments.

Thus, we are faced with a well-educated debtor, a physician, who is also a substantial investor and prudent businessman, being unable to locate substantial documentation relating to various estate assets. While Debtor is presently suffering from some chronic physical ailments, there has been no attempt by his counsel or any other party, to have Debtor adjudged mentally incompetent. We therefore find no sufficient explanation for the lack of adequate recordkeeping in this case; Debtor's discharge will be denied pursuant to § 727(a)(3).

■ The propriety of Debtor's discharge has also been questioned in relation to his Schedules and Statement of Affairs. Section 727(a)(4)(A), which covers this objection, states:

(a) The court shall grant the debtor a discharge, unless—

(4) the debtor knowingly and fraudulently, in or in connection with the case—

(A) made a false oath or account;

Two elements must be proved in order for discharge to be denied under this section:

1) the debtor's oath must have been knowingly and fraudulently made; and

2) it must have been related to a material fact.

*Matter of Brooks, supra; In re Lineberry*, 55 B.R. 510 (Bankr.W.D.Ky.1985).

As we previously stated in *Brooks, supra* at 467:

> If a false statement or omission of fact in a Statement of Financial Affairs or Schedule is due to mistake, the discharge is generally not denied. However, the purpose of § 727(a)(4)(A) is to insure that debtors provide all of the necessary information upon which anyone with reason to know can rely ... Additionally, the materiality of the false oath or account does not require that any of the creditors were prejudiced by the false statement. Rather, *the question of materiality goes to the issue of the pertinence to the discovery of assets and/or past transactions.* (citations omitted).

(Emphasis added.)

As stated in previous sections, Debtor's original Schedules were substantially unreliable, to-wit; after significant interrogation, Debtor requested the opportunity to amend his Schedules. Debtor's request did not stem from the recognition of an inconsequential, but later recognized error; rather, five months after filing his petition, and after vigorous questioning by his creditors, Debtor acknowledged *thirty* (30) additional assets valued at several hundred thousand dollars. If this were not enough, substantial *additional* assets were concealed from both the original Schedules and amendments. Debtor offered no explanation for this group of non-disclosed assets.

Debtor has contested this objection, claiming the creditors were not injured by these omissions, since Debtor claims them all as exempt; however, as we stated previously:

> the materiality of the false oath or account does not require that any of the creditors were prejudiced by the false statement.

*Brooks, supra* at 467.

Thus, as it is clear from the previous discussions in Sections I–VII, Debtor has knowingly and fraudulently made false oaths in this case.

By the same analysis, Debtor's discharge is denied under § 727(a)(4)(D) which states:

> (a) The court shall grant the debtor a discharge, unless—
>
> (4) the debtor knowingly and fraudulently in or in connection with the case—
>
> (D) withheld from an officer of the estate entitled to possession under this title, any recorded information, including books, documents, records, and papers relating to the debtor's property or financial affairs.

The Debtor states that he has steadfastly provided the Trustee with every document and record requested and that the Trustee has merely been on a "fishing expedition"; the state of the case indicates that this is only partially true. In fact, Debtor has made a practice of withholding documents, and reluctantly relinquishing same, only when "caught".

 Finally, Plaintiff asserts that Debtor's discharge should be denied pursuant to § 727(a)(5), for failing to satisfactorily explain any loss or deficiency of assets. *See In re Chalik*, 748 F.2d 616 (11th Cir.1984); *In re Martin*, 698 F.2d 883 (7th Cir.1983). Plaintiff carries the burden of identifying the assets in question as having belonged to Debtor and no longer available for distribution. Bankruptcy Rule 4005. Once Plaintiff establishes his case, the burden shifts to Debtor to provide a satisfactory explanation. *In re Sklarin*, 69 B.R. 949 (Bankr.S.D.Fla.1987). The Court must determine "... that it is dealing with more than an unreliable remake of reality, custom-made to comport with current exigencies." *In re Hendren*, 51 B.R. 781, 789 (Bankr.E.D.Tenn.1985), *quoted in In re Shapiro, supra*.

In the instant case, Plaintiff questions Debtor's inability to explain substantial losses in his capacity as Settlor and Trustee of the pension plan, and his lack of knowledge regarding the whereabouts of bonds having a total value in excess of $100,000.00. Debtor gave specious, off-the-cuff explanations for the diminution of pension plan assets, but provided no supporting evidence whatsoever. As regards the bonds, Debtor was unable to explain their present status, all the while knowing that

they constitute freely negotiable, bearer paper.

Debtor's unexplained loss of assets, in both his individual and corporate capacities, is completely unacceptable to this Court and demands the denial of a discharge. *In re Factory Tire Distributors, Inc., supra.*

## CONCLUSION

Based upon the foregoing Analysis, this Court has DETERMINED, and it will be ORDERED, ADJUDGED, DECREED that:

1) Debtor's Motion To Amend Schedules is DENIED same having been filed in bad faith;

2) Trustee's Objections to Debtor's Claimed Exemptions, Original and Amended, are GRANTED;

3) Trustee's Complaint for Turnover of Debtor's Medical Corporation is GRANTED;

4) Trustee's Complaint for Avoidance of Transfers made by the Debtor to Himself and His Wife is GRANTED;

5) Trustee's Complaint for Avoidance of Transfers made to the Joint Venture is GRANTED;

6) Trustee's Complaint for Turnover of Debtor's Pension Plan is GRANTED;

7) Judgment Creditors' Objections to the Dischargeability of Their Debt is GRANTED; and

8) Judgment Creditors' Objection to Debtor's Discharge is GRANTED.